# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                    )
**MICHAEL BENNETT**, *et al.*,          )
                                    )
           **Plaintiffs,**               )
                                    )
        **v.**                          )          **Civil Action No. 03-1486 (RCL)**
                                    )
**ISLAMIC REPUBLIC OF IRAN**, *et al.*, )
                                    )
           **Defendants.**               )
_____)

## MEMORANDUM OPINION

## BACKGROUND

These actions arise from the  July 31, 2002 bombing of the cafeteria at the Frank Sinatra

Building on the campus of Hebrew University in Jerusalem, Israel.  Plaintiffs allege that the

Islamic Republic of Iran ("Iran"), and the Iranian Ministry of Intelligence and Security ("MOIS"),

are jointly and severally liable for damages from the attack because they provided material

support and assistance to Hezbollah, the terrorist organization that orchestrated and carried out

the bombing.  Plaintiffs have relied upon causes of action founded upon provisions of the

Foreign Sovereign Immunities Act ("FSIA"), inter alia, 28 U.S.C. § 1605(a)(7).

## PROCEDURAL HISTORY

On July 2, 2003, plaintiffs filed their Complaint with this Court, in which they sought

redress for their losses under the FSIA.  Plaintiffs made various attempts at serving the

defendants with process, as prescribed under the FSIA.  *See* 28 U.S.C. § 1608(a).  Upon request

of the plaintiffs, default was entered by the Clerk of this Court against defendant Iran on March

23, 2004, and against defendant MOIS on April 19, 2006, after plaintiffs established proof of service of process on both defendants through diplomatic channels, and neither defendant responded within the prescribed time.

On March 12 and 13 of this year, an evidentiary hearing was held by this Court as to the defendants' involvement in the attack.  Based on all of the evidence presented to the Court at the hearing, the Court makes the following findings of fact and conclusions of law.  Consistent with these findings and conclusions, the Court will enter default judgment in favor of plaintiffs, and against defendants Iran and MOIS.

## **FINDINGS OF FACT**

1.  The plaintiffs, Linda Bennett and Michael Bennett are the parents of the decedent, Marla Bennett.  The plaintiffs are residents of and domiciliaries of the State of California, and were residents of California at the time of the attack.

2.  Plaintiffs bring this action in their capacities as co-administrators of the Estate of Marla Bennett, and on their own behalf having suffered damages through the intentional infliction of emotional distress upon them, as well as on behalf of Lisa Bennett (surviving sister of Marla Bennett), and Florence Ackerman (maternal grandmother of Marla Bennett).

3.  Marla Bennett was born on April 5, 1978, in San Diego, California, United States of America, and was at birth and remained until her death, a citizen of the United States and domiciliary of California.

4.  Marla Bennett was a graduate of the University of California at Berkley, and was a student at the Hebrew University of Jerusalem at its Mount Scopus facility in

Jerusalem, Israel in a program designed to educate persons for entry into the field of Jewish religious education at the time of her death on July 31, 2002.

5.   Marla Bennett had increasingly become interested in pursuing a life in Jewish religious education throughout her years as a student at the University of California.  She had spent her junior year of college in Israel as part of her University of California studies.

6.   Muhammad Uda ("Uda") was in 2002 an employee of a firm which had contracted with the Hebrew University of Jerusalem to act in a maintenance function in care of the physical facilities at the University.  In 2002, Uda had been so employed in this capacity for more than 6 years by 2002.  Unknown to the University, Uda had become a member of Hamas, a terrorist group also known as the Islamic Resistance Movement.

7.   Uda lived in a suburb of Jerusalem called Silwan. By July 2002, activities of the small segment of Hamas known as the Silwan Gang, of which Muhammad Uda was a member, had come to the attention of the Israeli National Police.  At the time, Uda had not yet been identified by the Israeli National Police as a member of the Silwan Gang.

8.   In the months around July 2002, Uda suggested the Hebrew University as a possible bomb target for the Silwan Gang to strike.  The gang agreed with Uda's suggestion, and selected the cafeteria at the Frank Sinatra Building as the point of attack.

9.   The Silwan Gang then involved Ibrahim Hamed ("Hamed"), a Hamas leader, who

in turn gave the go ahead to the attack plan with the instruction that it was to be carried out in such a manner as to avoid injury to Arab students at the Hebrew University.  In order to abide by this condition, the decision was made to carry out the attack at a time between regular educational sessions at a time when most of the regular student body would be absent.  Such a time came in late July when most of the people who would be in the Cafeteria at the Frank Sinatra Building would be members of the international program.  As a result, most of the persons present during this time would be Americans.

10.     The bomb was constructed by an Hamas operative and passed to Uda over a fence near the edge of the University by an Hamas associate.  On July 28, 2002, Uda placed the bomb in the cafeteria.  Uda then left the school and attempted to trigger the mechanism from a few blocks away, but the trigger failed.  Uda then recovered the device and it was repaired.

11.     On July 30, 2002, the bomb was again passed over the fence to Uda and kept in a storage shed until the next day when it was again positioned in the cafeteria in the Frank Sinatra Building.  The explosive charge was surrounded by pieces of metal including bolts.

12.     Just after 1:00 p.m. on July 31, 2002, Marla Bennett entered the cafeteria at the Frank Sinatra Building for lunch.  After obtaining a bowl of soup she sat down at a table opposite Ari Joseph, an accountant at the school.  Mr. Joseph testified that he bent over toward his bowl of soup and the world "turned black."  He was blown over backwards by the explosion.  He couldn't see and there seemed to be

dead silence.

13.  Hamas, the popular name for the Islamic Resistance Movement, is an organization
     supported by The Islamic Republic Of Iran, dedicated to the waging of Jihad, or a
     holy war employing terrorism with the object of seizing the leadership of the
     Palestinian people and asserting sovereignty and the rule of the Muslim religion
     over all of Palestine, including all territory of the State of Israel.

14.  Hamas immediately claimed credit for the attack on the cafeteria at the Frank
     Sinatra Building, and there is no reason to question that claim.

15.  Dr. Reuven Paz, an internationally recognized authority on terrorism–and an
     individual who this Court has repeatedly found to be extremely credible in this
     field–testified that Hamas acknowledges that Iran is a major source of support for
     the organization.

16.  Dr. Paz further established that the Defendant, The Islamic Republic Of Iran, and
     the Defendant, The Iranian Ministry of Information and Security ("MOIS"), knew
     of the purpose and objectives of Hamas, which were set forth in detail in the
     published Charter of Hamas.

17.  Defendant, the Islamic Republic of Iran, is a foreign state and has been designated
     a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration
     Act of 1979 (50 U.S.C. App. Section 2405(j)) continuously since January 19,
     1984.  Defendant MOIS is a division of the Islamic Republic of Iran, and is
     therefore treated as a part of the state of Iran itself.

18.  The testimony of Dr. Ricardo Nachman, Deputy Director of the Israeli National

Institute of Forensic Medicine, who performed the postmortem examination of Marla Bennett's body, established that her death was not instantaneous. Rather, a resuscitation tube was found in her body at the scene, which indicates that there was some sign of life when the emergency medical team arrived.

19. Still, in Dr. Nachman's opinion, Marla Bennett's wounds–including one caused by a bolt that struck Marla Bennett on the left side of the head above her eye–were undeniably fatal, even if emergency medical personnel were at the scene at the time the bomb was detonated.

20. The death of Marla Bennett was caused by a willful and deliberate extrajudicial killing because it was caused by a detonation of explosive material planted by Muhammad Uda in the cafeteria at the Frank Sinatra Building on July 31, 2002, and intentionally detonated by him on or around 1:00 p.m. on that date.

21. As a result of the death of Marla Bennett, her estate suffered a loss of accretions after deduction for statistically determined future living costs and taxes which could have been expected to occur during the course of her anticipated life expectancy.

22. The net calculated amount of loss to the Estate of Marla Bennett is $404,548.00.

23. As the result of the death of Marla Bennett, her parents, Linda and Michael Bennett, her sister, Lisa Bennett, and her maternal grandmother, Florence Ackerman, have suffered and will continue to suffer severe mental anguish and the loss of society.

### **CONCLUSIONS OF LAW**

I.      *Jurisdiction*

In the United States, the Foreign Sovereign Immunities Act provides the sole basis for asserting jurisdiction over foreign sovereigns. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-34 (1989). A party may generally not bring an action for money damages in U.S. courts against a foreign state. 28 U.S.C. § 1604. The "state-sponsored terrorism" exception, however, removes a foreign state's immunity to suits for money damages brought in U.S. courts where plaintiffs are seeking damages against the foreign state for personal injury or death caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency." 28 U.S.C. § 1605(a)(7).

In order to subject a foreign sovereign to suit under section 1605(a)(7), plaintiffs must show that: (1) the foreign sovereign was designated by the State Department as a "state sponsor of terrorism"; (2) the victim or plaintiff was a U.S. national at the time the acts took place; and (3) the foreign sovereign engaged in conduct that falls within the ambit of the statute. *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 305 (D.D.C. Dec. 22, 2006) (Lamberth, J.) (citing *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 158 (D.D.C. Mar. 28, 2006) (Lamberth, J.)).

Each of the requirements is met in this case. First, defendant Iran has been designated a state sponsor of terrorism continuously since January 19, 1984, and was so designated at the time of the attack. *See* 31 C.F.R. § 596.201 (2001); *Flatow*, 999 F. Supp. at 11, ¶ 19. Second, both

the plaintiffs and the victim to which they are related, Marla Bennett, were United States

nationals at the time the bombing occurred.  Finally, defendant Iran's persistent financial and

organizational support of an entity that committed an extrajudicial killing squarely falls within

the ambit of the statute.  Defendant MOIS is considered to be a division of state of Iran, and is

treated as a member of the state of Iran itself.  *Roeder*, 333 F.3d at 234; *see also Salazar v.*

*Islamic Republic of Iran*, 370 F. Supp. 2d 105, 116 (D.D.C. 2005) (Bates, J.) (analogizing the

IRGC to the MOIS for purposes of liability, and concluding that both must be treated as the state

of Iran itself).  Therefore, the same determinations apply to their conduct as to that of Iran.

Personal jurisdiction exists over a non-immune sovereign so long as service of process

has been made under section 1608 of the FSIA.  *See Stern v. Islamic Republic of Iran*, 271 F.

Supp. 2d 286, 298 (D.D.C. 2003) (Lamberth, J.).  In this case, service of process has been

effected under that provision.  Accordingly, this Court has *in personam* jurisdiction over

defendants Iran and MOIS.

## II.      *Legal Standard for FSIA Default Judgment*

Under the Foreign Sovereign Immunities Act, "[n]o judgement by default shall be entered

by a court of the United States or of a state against a foreign state . . . unless the claimant

establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e);

*Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232-33 (D.C. Cir. 2003), *cert. denied*, 542

U.S. 915 (2004).  In default judgment cases, plaintiffs may present evidence in the form of

affidavits.  *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 82 (D.D.C. Mar. 29, 2006)

(quoting *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003)).

Upon evaluation, the court may accept any uncontroverted evidence presented by plaintiffs as

true. *Heiser*, 466 F. Supp. 2d at 255 (citing *Campuzano*, 281 F. Supp. 2d at 268).  This Court

accepts the uncontested evidence and testimony submitted by plaintiffs as true in light of the fact

that the defendants in this action have not objected to it or even appeared in this action to contest

it.

III.     *Liability*

      *A.     Proper Causes of Action Under the FSIA*

      The FSIA does not itself provide a cause of action, but rather "acts as a 'pass-through' to

substantive causes of action against private individuals that may exist in federal, state or

international law." *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 54 (D.D.C. Sept. 29,

2006) (Lamberth, J.) (citing *Dammarell v. Islamic Republic of Iran*, Civ. A. No. 01-2224, 2005

WL 756090, at *8-10, 2005 U.S. Dist. LEXIS 5343, at *27-32 (D.D.C. Mar. 29, 2005) (Bates,

J.)).

      In this case, state law provides a basis for liability.[1]  In order to determine the applicable

state law to each action, the Court must look to the choice of law rules of the forum, in this case,

the choice of law rules of the District of Columbia.  *See Blais*, 459 F. Supp. 2d at 54.  Under

District of Columbia choice of law rules, courts employ a modified government interest analysis

under which they "evaluate the governmental policies underlying the applicable laws and

determine which jurisdiction's policy would be most advanced by having its law applied to the

facts of the case under review." *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C.

---

[1] Obviously, the law of the United States applies rather than the law of the place of the
tort or any other foreign law because the United States has a "unique interest" in having its
domestic law apply in cases involving terrorist attacks on United States citizens.  *See Dammarell*,
2005 WL 756090, at *20, 2005 U.S. Dist. LEXIS 5343, at *63.

1989) (citations and internal quotations omitted).  Application of this governmental interest test generally points to the law of plaintiff's domicile as having the greatest interest in providing redress to its citizens.  Accordingly, the validity of each of the plaintiffs' claims shall be determined by the state in which they were domiciled at the time of the attack.

Here, the laws of California govern the claims brought by plaintiffs because each plaintiff and the deceased was a domiciliary of California at the time of the attack.  Upon examination of the law of California, the Court concludes that California provides a cause of action against private individuals for the kind of acts that defendants allegedly committed.  Plaintiffs seek damages for wrongful death and for intentional infliction of emotional distress, both torts for which private individuals may face liability.  The Court's next task is to determine whether plaintiffs have demonstrated defendants' liability and their right to damages under the laws of California.

### B.    *Vicarious Liability*

The purported basis of defendants' liability is that they provided material financial support and resources to Hamas, the organization whose members personally perpetrated the attack on Marla Bennett.  Under a theory of vicarious liability, a party may be liable for the acts of another, including conspiracy, aiding and abetting, and inducement.  Accordingly, this Court finds that civil conspiracy provides a basis of liability in this case for defendants Iran and MOIS, provided such a theory exists under California law.

California recognizes the theory of civil conspiracy.  "The elements of an action for civil conspiracy [in California] are (1) formation and operation of the conspiracy and (2) damage resulting to plaintiff (3) from a wrongful act done in furtherance of the common design."

10

*Rusheen v. Cohen*, 128 P.3d 713, 722 (Cal. 2006).

As this Court has previously held, "sponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks." *Flatow*, 999 F. Supp. At 27.  It is undisputed that members of Hamas committed this extrajudicial killing of Marla Bennett, and indeed took credit for it.  It has also been established by evidence satisfactory to this Court that Iran has continuously provided material support to and sponsorship of Hamas and its members so that they may undertake terrorist attacks like the one in this action.  Moreover, it is clear that this attack was approved and sponsored by senior members of Hamas, one of whose members helped construct the bomb used in the attack.   The evidence also clearly shows that the goal Uda and his associates maintained was to do an unlawful act towards as many American citizens as possible. In addition, the nature of the attack that killed Marla Bennett demonstrates that the defendants also intended to inflict severe emotional distress upon as many individuals, as well as their close relatives.  The many acts undertaken by Uda to seek approval, the failed attempt to detonate the bomb, and the ultimate horrific act of detonating a bomb that killed innocent people ably qualify as acts in furtherance of the unlawful common design in this case.  Finally, extreme amounts of damage were incurred by Marla Bennett and her family as a result of the conspiracy. Accordingly, this Court finds that the elements of civil conspiracy under California law are established between Hamas and defendant Iran and MOIS.

C.     *Plaintiffs Claims*

1.     *Wrongful Death*

Under California law, a wrongful death cause of action arises "for the death of a person caused by the wrongful act or neglect of another."  Cal Civ. Proc. Code § 377.60(a).  This cause

of action may be asserted by a number of individuals, including the decedent's surviving spouse, children, personal representative, and, when the decedent has no surviving spouse or children, the decedent's parents. *Id.*; *Nelson v. County of Los Angeles*, 6 Cal. Rptr. 3d 650, 654-56 (Cal. Ct. App. 2003).

A plaintiff asserting a wrongful death claim is entitled to such damages that, under the circumstances of the case, may be just. Cal Civ. Proc. Code § 377.61. In California, "just" damages that a wrongful death plaintiff may recover include "lost present and future economic support as well as the pecuniary (as opposed to sentimental) value of such factors as lost comfort, society, companionship, care and protection."[2] The amount of available damages in claims brought by a decedent's personal representative are limited, however, and do not include damages for pain, suffering or disfigurement.[3]

In this case, Marla Bennett has no surviving spouse or children. Therefore, her parents may properly bring a wrongful death action on her behalf for the benefit of those entitled to the property of the decedent by intestate succession.[4] Cal Civ. Proc. Code § 377.60(a) (2007). At

---

[2] *Fox v. Pacific Southwest Airlines*, 184 Cal.Rptr. 87, 89 (Cal. Ct. App. 1982), *disavowed on other grounds by*, *Canavin v. Pacific Southwest Airlines*, 196 Cal.Rptr. 82 (Cal. Ct. App. 1983).

[3] Cal. Civ. Proc. Code § 377.34 (2007) ("In an action or proceeding by a decedent's personal representative . . . , the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement."); Cal. Civ. Proc. Code § 377.61 (stating that "just" damages arising out of a wrongful death action *do not include* those damages allowed under Section 377.34)

[4] Plaintiffs' complaint states that Michael Bennett and Linda Bennett are the Co-Administrators of Marla Bennett's estate and in that capacity, plaintiffs represent Marla Bennett's other beneficiaries pursuant to federal and California state law, including Lisa Bennett,

12

trial, plaintiffs produced testimony from Dr. Jerome Paige detailing the loss of accretions to the estate of Marla Bennett as $404,548.00.  Upon review, the Court concludes that these calculations are appropriate, and finds that the estate of Marla Bennett is entitled to $404,548.00 in damages for wrongful death.

The estate of Marla Bennett has also sought $1 million in damages for pain and suffering arising out of the a survival claim,[5] due to the fact that Marla was alive for an undetermined amount of time after the attack before she died at the scene.  Under California law, however, "survival statutes do not create a cause of action but merely prevent the abatement of the decedent's cause of action and provide for its enforcement by the decedent's personal representative or successor in interest."  *San Diego Gas & Elec. Co. v. Superior Court*, 53 Cal.Rptr.3d 722, 728 (Cal. Ct. App. Jan. 25, 2007).  Moreover, "[d]amages for a survivor claim include punitive damages and all the decedent's losses incurred prior to death, *but exclude any award for the decedent's pain or suffering.*" (emphasis added).  Therefore, the estate of Marla Bennett may not recover for pain and suffering based on a survivor claim under California law.

2.    *Intentional Infliction of Emotional Distress*

In California, the elements of the tort of intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant with the intent to cause, or with reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffering severe or extreme emotional distress; and (3) the defendant's conduct is the actual and proximate cause of

---

decedent's sister, and decedent's grandmother, Flo Ackerman.  *See* Pls.' Compl., at ¶ 2.  The Court will therefore construe plaintiffs' complaint to include a claim for damages by Lisa Bennett and Flo Ackerman.

[5] Plaintiffs cite Cal. Civ. Proc. Code § 377.20, 377.21 (2007).

the plaintiff's emotional distress. *Davidson v. City of Westminster*, 649 P.2d 894, 901 (Cal. 1982). Under California law, in order for a plaintiff to have standing to recover for an intentional infliction of emotional distress claim, there is a requirement that the conduct either is directed at a plaintiff or occur within the plaintiff's presence. *See Christensen v. Superior Court*, 820 P.2d 181, 203-204 (Cal. 1992). The plaintiff's presence is not, however, always required, and is deemed unnecessary in situations where the defendant is aware of the high probability that the defendant's acts will cause a plaintiff severe emotional distress. *Id.*

In *Heiser*, this Court found that, when a terrorist attack occurs, the presence element is not required to bring a valid IIED claim under California law, and that plaintiffs domiciled in California at the time of the attack may bring a claim for IIED without establishing their presence at the scene of the injury.[6] *Heiser*, 466 F. Supp. 2d at 305. As has been noted by this Court and courts of other jurisdictions, "a terrorist attack-by its nature-is directed not only at the victims but also at the victims' families." *Id.* (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) (Bates, J.)). Here, the evidence demonstrates that the defendants' motives in providing consistent material support for the terrorist group that carried out this attack was intended to harm both the victims of the attack, and to instill terror in their loved ones and others in the United States. Accordingly, in the case of a terrorist attack as this, the Court finds that the presence element does not need to be proven in order to successfully bring a cause of action for intentional infliction of emotional distress under California law.

---

[6] This finding, of course, is on the assumption that those plaintiffs have standing to recover in the first place. Those plaintiffs without standing to recover under the law of their respective domiciliary states may not recover, regardless of whether a plaintiff with standing could so recover.

14

In its discussion of the tort of intentional infliction of emotional distress, comment l to Section 46 of the RESTATEMENT (SECOND) OF TORTS notes that recovery for third-parties has typically been granted to members of the victim's "near relatives." RESTATEMENT (SECOND) OF TORTS § 46, cmt. l.   The Court finds this approach to be a logical one.  Accordingly, under California law, a victim's near relatives–that is, their immediate family–who were not present may nonetheless have standing to seek redress under a claim of intentional infliction of emotional distress.

This Court has previously deemed near relatives to include only the victim's spouse, parents, children, and siblings.  *See Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2002) (Lamberth, J.), *affirmed sub nom.*, *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 335 (D.C. Cir. 2003).  Though the Court does not deny the extreme pain and suffering felt by those outside of this class of individuals, it is necessary to draw such a line at immediate family members in order "to prevent a potentially unlimited number of plaintiffs who were not present at the site of the attack from seeking redress."  *Heiser*, 466 F. Supp. 2d at 329. Moreover, such a delineation is consistent with the provisions of Section 46 of the Restatement. See Restatement (Second) of Torts § 46, cmt. l; *cf. Bettis*, 315 F.3d at 335 (finding that permitting nieces and nephews to recover under § 46(1) would undermine the limitations on recovery of "immediate family" members under § 46(2)).  Therefore, those plaintiffs who are not members of this class of individuals in relation to the servicemen cannot recover.  Accordingly, the Court must dismiss the claim brought by Marla Bennett's maternal grandmother, Florence Ackerman.

The Court must now assess the merits of the claims brought by the remaining plaintiffs in

15

this action: Linda and Michael Bennett (Marla's parents), and Lisa Bennett (Marla's sister). Based upon the evidence presented to the Court, the elements of intentional infliction of emotional distress claim are met for each. The defendants' conduct in facilitating, financing, and providing material support to Hamas, who brought about this attack was intentional, extreme, and outrageous. As the evidence shows, this horrific terrorist attack that was precipitated by the defendants' financial support and sponsorship brought extreme emotional distress to Linda Bennett, Michael Bennett, and Lisa Bennett. Finally, it is clear that Linda Bennett, Michael Bennett, and Lisa Bennett have continued to experience severe emotional distress since the time of the attack due to the fact that their daughter and sister was taken away from them in such an unspeakably tragic and awful manner.

IV.    *Damages*

A.    Wrongful Death Damages

For the reasons stated previously,[7] the estate of Marla Bennett is entitled to $404,548.00 in damages for wrongful death.

B.    *Compensatory Damages*

As a result of the wrongful conduct of defendants Iran and MOIS, plaintiffs have suffered and will continue to suffer pain and mental anguish. Under the FSIA, if a foreign state may be held liable, it "shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. Accordingly, the plaintiffs who have successfully brought claims before this Court in this action are entitled to the typical bases of damages that may be awarded against tortfeasors under the laws of California.

---

[7] *See supra* Section III.C.1.

In determining the appropriate amount of compensatory damages, the Court may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium. *Prevatt*, 421 F. Supp. 2d at 160. "While intervening changes in law have ruled many cases' reliance on federal common law improper, such findings need not disturb the accuracy of the analogy between solatium and intentional infliction of emotional distress." *Haim*, 425 F. Supp. 2d at 71. Following this framework, this Court recently awarded the valid claims brought by spouses of deceased servicemen $8 million in pain and suffering, parents and children of deceased servicemen $5 million, and siblings of deceased servicemen $2.5 million. *See generally Heiser*, 466 F. Supp. 2d at 271-356. This Court finds that the damages framework set forth in *Heiser* to be an appropriate measure of damages in this case. Therefore, this Court shall award to Linda and Michael Bennett $5 million, each, to compensate each for the emotional distress, pain and suffering that each sustained as a result of their daughter's untimely death. Further, this Court shall award to Lisa Bennett $2.5 million to compensate her for the emotional distress, pain and suffering that she sustained as a result of her sister's untimely death.

B.      *Punitive Damages*

Punitive damages are not available against foreign states. 28 U.S.C. § 1606. Therefore, punitive damages are not against defendant Islamic Republic of Iran. Additionally, punitive damages are not recognized against divisions of a foreign state that are considered to be the state itself, instead of an agent or instrumentality thereof.[8] For punitive damages purposes, the court must consider the core functions of the entity. *Roeder*, 333 F.3d at 234. This Court has already

---

[8] *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 161 (D.D.C. 2006) (Lamberth, J.) (citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 222, 234 (D.C. Cir. 2003).

found as a matter of fact that defendant MOIS is a division of the state of Iran, and is therefore

considered a part of the state of Iran.  Accordingly, punitive damages also may not be sought

against defendant MOIS.  Therefore, plaintiffs' claims for punitive damages must be

DISMISSED.

<u>**CONCLUSION**</u>

This Court is cognizant of the extreme pain and suffering felt by each of the plaintiffs in

this action for losing a person who, by all accounts, was a shining light of the lives of so many.

The plaintiffs should be praised for their courageous and steadfast pursuit of justice through legal

means.  This noble effort is made even more so when contrasted with the heinous and brutishly

unlawful acts undertaken by the defendants and the individuals they support.  Though it is

impossible for this Court to make the plaintiffs completely whole again, the Court hopes that this

award helps begin the healing process, and that one day the plaintiffs' hearts and minds will be

mended by the fact that some measure of justice–no matter how incalculable–was done on their

behalf.

A judgment consistent with these findings shall issue this date.

SO ORDERED.

Signed by Royce C. Lamberth, United States District Judge, August 13, 2007.