**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| MICHAEL BENNETT | ) | |
| and | ) | |
| LINDA BENNETT, | ) | |
| Individually and as Co-Administrators of | ) | |
| The Estate of MARLA ANN BENNETT | ) | |
|  | ) | |
| Plaintiffs, | ) | |
|  | ) | Civil Action No. 03-1486 (RCL) |
| v. | ) | |
|  | ) | |
| THE ISLAMIC REPUBLIC OF IRAN, et al., | ) | |
|  | ) | |
| Defendants. | ) | |

---

## UNITED STATES' MOTION TO QUASH PLAINTIFFS' WRITS OF ATTACHMENT

The United States respectfully moves to quash in their entirety five writs of attachment issued by the Clerk of this Court on April 1, 2008.  These writs attach properties of the government of Iran that are used for diplomatic purposes.  The properties were used by Iran as office and residential space for the Iranian diplomatic mission to the United States until the United States severed diplomatic relations with Iran in 1980.  These properties have since been held in the protective custody of the United States pursuant to its international obligations under the Vienna Convention on Diplomatic Relations.  They are immune from attachment under the laws of the United States.

Support for this motion is found in the accompanying memorandum and exhibits.

Respectfully submitted this 18th day of July, 2008.

GREGORY G. KATSAS

1

Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

JOSEPH H. HUNT
Director, Federal Programs Branch

VINCENT M. GARVEY
Deputy Director, Federal Programs Branch

*/s/ Varu Chilakamarri*
VARU CHILAKAMARRI (NY Bar)
Trial Attorney, Federal Programs Branch
U.S. Department of Justice, Civil Division
Tel: (202) 616-8489
Fax: (202) 616-8470
varudhini.chilakamarri@usdoj.gov
Courier Address:
20 Massachusetts Ave., NW, Rm. 7226
Washington, D.C. 20530

*Counsel for the United States of America*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
MICHAEL BENNETT                         )
and                                     )
LINDA BENNETT,                          )
Individually and as Co-Administrators of )
The Estate of MARLA ANN BENNETT        )
                                        )
                     Plaintiffs,        )
                                        )          Civil Action No. 03-1486 (RCL)
          v.                            )
                                        )
THE ISLAMIC REPUBLIC OF IRAN, et al.,   )
                                        )
                     Defendants.        )
_____)

**MEMORANDUM IN SUPPORT OF UNITED STATES'
MOTION TO QUASH WRITS OF ATTACHMENT**

**INTRODUCTION**

Plaintiffs brought suit against Iran and the Iranian Ministry of Intelligence and Security in

the United States District Court for the District of Columbia for a terrorist act by Hamas resulting

in the death of their daughter.  This Court entered a default judgment in the amount of

$12,904,548.  Plaintiffs have now served writs of attachment on Iranian diplomatic properties

situated in the District of Columbia in an effort to satisfy their judgment.[1]

The United States has the deepest sympathy for the suffering experienced by the

plaintiffs and abhors the actions which gave rise to their judgment.  However, attachment of the

_____

[1] On March 26, 2008, after filing their Motion for Order to Issue Writs of Attachment and accompanying memoranda, plaintiffs filed a Withdrawal of their Motion for an Order to Issue Writs of Attachment.  See Doc. No. 26.  Subsequently, however, the writs were issued by this Court, and the plaintiffs appear to be pursuing the attachment of these properties, as they filed executed returns of these writs.  See Doc. Nos. 27-31.

properties targeted by plaintiffs' writs is not permitted under the laws of the United States and would have the effect of placing the United States in violation of its international obligations. Indeed, similarly situated plaintiffs previously have sought to attach the exact properties at issue here, and this Court has repeatedly determined that these properties are immune from attachment.[2]  The same conclusion should be reached in this case.  As a result, the United States hereby respectfully requests that the plaintiffs' writs of attachment be quashed in their entirety.[3]

## LEGAL AND FACTUAL BACKGROUND

**A.      International Treaty and Statutory Obligations Regarding Diplomatic Property**

The United States has entered into treaties and international agreements that establish its obligation to protect diplomatic property against interference.  Foremost among those treaties is the Vienna Convention on Diplomatic Relations ("Vienna Convention"), which establishes that the "premises of a foreign mission shall be inviolable," "immune from search, requisition, attachment or execution," and that "[t]he receiving State is under a special duty to take all appropriate steps to protect the premises of the mission."  Article 22 of the Vienna Convention, 23 U.S.T. 3227 (1972), T.I.A.S. No. 7502.  The residence of a diplomat enjoys the same protection as the premises of the mission.  Vienna Convention, Article 30(1).   Further, the Vienna Convention requires the host country to take steps to protect the property of diplomatic

---

[2]  See, e.g., Mousa v. Islamic Republic of Iran, No. 00-2096 (D.D.C. Nov. 5, 2003); Elahi v. Islamic Republic of Iran, No. 99-02802 (D.D.C. July 22, 2003); Flatow v. Islamic Republic of Iran, 76 F. Supp. 2d 16 (1999).

[3]  The United States appears in this action pursuant to 28 U.S.C. § 517, which authorizes the Attorney General of the United States to send any officer of the Department of Justice to "attend to the interests of the United States in a suit pending in a court of the United States, or in the courts of a State, or to attend to any other interest of the United States."  See also infra at 10-12.

missions even under exceptional circumstances.  For example, under Article 45(a) of the Vienna

Convention, if diplomatic relations are broken or if a mission is permanently or temporarily

recalled, the receiving state "must even in the case of armed conflict, respect and protect the

premises of the mission, together with its property and archives."

The Foreign Missions Act, 22 U.S.C. §§ 4301, et seq., provides that the Department of

State, Office of Foreign Missions ("OFM") is to protect the property of foreign missions in

various circumstances.  The Foreign Missions Act authorizes OFM to "protect and preserve any

property of [a] foreign mission" if that mission has ceased conducting diplomatic, consular and

other governmental activities and has not designated a protecting power (or other agent)

approved by the Secretary to be responsible for the property of that foreign mission.  Id.

§ 4305(c).  The Foreign Missions Act also prohibits the attachment of or execution upon such

mission property being held by the Department of State.  Specifically, 22 U.S.C. § 4308(f)

provides that:

> Assets of or under the control of the Department of State, wherever situated,
> which are used by or held for the use of a foreign mission *shall not be subject to
> attachment, execution*, injunction, or similar process, whether intermediate or
> final.

Id. (emphasis added); see also 28 U.S.C. § 1609 (generally prohibiting the attachment of a

foreign state's property, subject to the existing international agreements to which the United

States is a party).

**B.     Legislation Governing the Attachment of Foreign Property in the United States**

As relevant in this case, two statutes provide the means of attaching foreign property in

the United States:  the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602, *et seq.*,

and the Terrorism Risk Insurance Act ("TRIA"), Pub. L. No. 107-297, Title II, § 201 (Nov. 26, 2002), codified at 28 U.S.C. § 1610 note.

In pertinent part, the Foreign Sovereign Immunities Act ("FSIA") provides that "the property in the United States of a foreign state shall be immune from attachment[,] arrest and execution except as provided in section[ ] 1610 . . . of this chapter."  28 U.S.C. § 1609.  In turn, section 1610 provides various exceptions to the immunity from attachment.  Section 1610(a)(7) provides that the property of a foreign state is not immune from attachment where it has been "used for a commercial activity in the United States" and "the judgment relates to a claim for which the foreign state is not immune under [28 U.S.C. §] 1605A."[4]  Id. § 1610(a)(7).  Section 1610(f) of the FSIA also states that certain foreign property shall be subject to attachment in aid of execution of a judgment for which the foreign state "is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A."  Id. § 1610(f)(1)(A).[5]

---

[4]  The FSIA was recently amended by section 1083 of the National Defense Authorization Act for Fiscal Year 2008, P.L. 110-181 (January 28, 2008); 122 Stat. 3.  The amendments repealed section 1605(a)(7) of the FSIA, which had provided an exception to a foreign state's jurisdictional immunity for actions against designated state sponsors of terrorism for personal injury or death.  The amendments created a new FSIA section, section 1605A which, inter alia, reasserts the exception (previously codified at 28 U.S.C. § 1605(a)(7)) to jurisdictional immunity for actions against designated state sponsors of terrorism, and creates a federal cause of action against foreign states for such actions.  See P.L. 110-181 § 1083(a), (c); 28 U.S.C. § 1605A(a), (c).  The amendments also provide a framework and a 60-day statutory deadline for converting pre-existing actions brought under section 1605(a)(7) into actions under new section 1605A.  See P.L. 110-181, Div. A., Title X § 1083(c); 28 U.S.C. § 1605A note.  Furthermore, the amendments added a new section 1610(g), which is applicable to actions brought under new section 1605A.  Section 1610(g) will be discussed in more detail below.

[5]  Specifically, section 1610(f)(1)(A) states:

Notwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. 4308(f)), and except as provided in subparagraph (B), any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)),

However, section 1610(f)(3) provides the President authority to waive section 1610(f)(1) in the interest of national security, and the President acted on this authority by waiving section 1610(f)(1) in its entirety.  See Pres. Determination No 2001-03, 65 Fed. Reg. 66483 (2000).

In addition to the FSIA exceptions noted above, section 201 of TRIA provides for the "[s]atisfaction of judgments from blocked assets of terrorists, terrorist organizations, and State sponsors of terrorism."  Subsection (a) of this section specifically provides as follows:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, *the blocked assets of that terrorist party* (including the blocked assets of any agency or instrumentality of that terrorist party) *shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages* for which such terrorist party has been adjudged liable.

See Section 201(a) (emphasis added).  The Section further defines the term "blocked assets" as:

> (A) any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702); and
>
> (B) does not include property that-- . . .
>
>> (ii) in the case of property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, or that enjoys equivalent privileges and immunities under the law of the

---

section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701-1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality or such state) claiming such property is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A.

United States, is being used exclusively for diplomatic or consular purposes.

Section 201(d)(2).  Finally, the section provides the following definition with respect to

diplomatic and consular property:

> (3) CERTAIN PROPERTY.– The term "property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations" and the term "asset subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations" means any property or asset, respectively, the attachment in aid of execution or execution of which would result in a violation of an obligation of the United States under the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, as the case may be.

Section 201(d)(3).

As a result of Section 201(d)(2)(B)(ii)'s exclusion from "blocked assets," any property

subject to the Vienna Conventions on Diplomatic and Consular Relations that "is being used

exclusively for diplomatic and consular purposes," property that is used exclusively for

diplomatic purposes is not subject to TRIA.

## C.    Iranian Diplomatic Real Properties

The writs of attachment filed by plaintiffs implicate five parcels of real property that are

associated with the former mission of the government of Iran and that are currently under the

control of the Department of State.[6]  See Declaration of Claude J. Nebel, Deputy Assistant

Secretary of the Office of Foreign Missions, United States Department of State ("Nebel Decl."),

attached hereto as Exhibit 1, ¶¶ 14-19.  These particular diplomatic properties were blocked on

November 14, 1979 by Executive Order 12170, in response to the taking of the U.S. Embassy

---

[6] The properties are located at:  (1) 3003 Massachusetts Avenue, NW; (2) 3005 Massachusetts Avenue, NW; (3) 3410 Garfield Street, NW; (4) Lot 8, Square 2145, NW; and (5) Lot 0820, Square 2145, NW.

and hostages in Tehran.  Id. ¶¶ 5, 14-19.  Iran was permitted to continue to occupy and use its Embassy, consulates, and diplomatic residences until the United States severed diplomatic relations with Iran on April 7, 1980.  Id. ¶ 6.  As a result of that action, the United States took custody of all Iranian diplomatic and consular real properties.  Id. ¶ 6.

On April 14, 1980, the Department of State approved Algeria as the protecting power for Iranian interests in the United States. [7]  Nebel Decl. ¶ 8.  Because the United States and Iran were unable to reach agreement concerning the return of each other's diplomatic and consular property to the protecting power of the other state, the Department of State informed Algeria that the United States would retain custody over the diplomatic and consular properties of Iran.  Id.  It further informed Algeria that it would take all appropriate measures for the safety and protection of such diplomatic and consular premises in the United States.  Id.  The diplomatic and consular properties of Iran have remained in the custody of the Department of State since 1980, and specifically of the Department of State's Office of Foreign Missions ("OFM"), since that office was created in 1982.  See id. ¶ 10.  These properties have remained blocked pursuant to Executive Order 12170.  Id. ¶¶ 5, 14-19.

By a diplomatic note tendered on March 10, 1983, the United States notified Algeria that the United States would continue to respect and protect Iran's diplomatic and consular property pursuant to Article 45 of the Vienna Convention on Diplomatic Relations, adopted Apr. 18, 1961, T.I.A.S. No. 7502, 23 U.S.T. 3227, and that it intended to rent some of the properties in order to protect Iran's interest in these properties.  See Nebel Decl. ¶ 11.  The United States

---

[7]  Algeria is no longer the protecting power for Iranian interests.  Pakistan now serves that role.  See Nebel Decl. ¶ 8.

determined that rental of the properties would further its obligation to protect the properties by keeping them occupied and generating a source of funds that could be used for the maintenance of the properties.  See id.  Therefore, OFM has periodically leased all of the properties at issue here at various times to private parties or to other foreign governments' missions.  See id. ¶¶ 15-19.  Currently, three of the properties at issue (located at 3003 Massachusetts Ave., 3005 Massachusetts Ave., and 3410 Garfield St.) are vacant while OFM makes needed repairs, seeks new tenants, and explores other options for maintaining and preserving the properties.  See id. ¶¶ 15-17.  The remaining two parcels of land are lots that OFM periodically rents as parking lots to other foreign missions.  See id. ¶¶ 18-19.  All of the proceeds from OFM's rental of these five properties that are not necessary for maintenance and repair of the properties are deposited in a blocked Iranian diplomatic account, and are not used for any other purposes.[8]  Id. ¶ 12.

## ARGUMENT

At the outset, the United States wishes to address plaintiffs' contention that the United States does not have standing to assert the sovereign immunity of Iran as a bar to the attachment of this property, implying that the United States cannot oppose the attachments at issue.  See Pls. Am. Supp. Mem. in Support of Mot. for Order to Issue Writs of Attachment on Judgment, at 7, Rec. Doc. No 24.

---

[8] Funds that had accrued in this account as of the date of enactment of the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, were paid to certain individuals designated by Congress as eligible for payment.  See Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 2002, 114 Stat. 1464, 1541-43, as amended by the Terrorism Risk Insurance Act, of 2002, Pub. L. No. 107-297, § 201(d).

The Attorney General of the United States has broad authority under 28 U.S.C. § 517, to send any officer of the Department of Justice to "attend to the interests of the United States in a suit pending in a court of the United States."  Accordingly, by virtue of its interest in this matter, the United States has the right to enter this action and seek the necessary relief.

Moreover, it has long been established that the United States has standing to assert and protect *its* foreign policy interests, particularly as they relate to carrying out its obligations pursuant to international treaties.  See, e.g., Sanitary Dist. of Chicago v. United States,  266 U.S. 405, 425-426, (1925) (holding that the United States "has a standing in this suit not only to remove obstruction to interstate and foreign commerce . . . but also to carry out treaty obligations to a foreign power . . . . The Attorney General by virtue of his office may bring this proceeding and no statute is necessary to authorize the suit"); United States v. Arlington County, 669 F.2d 925, 928-929 (4th Cir. 1982) (holding that, where the United States filed a claim against the county to void all property tax assessments against German diplomatic property, "[t]he United States can sue to enforce its policies and laws, even when it has no pecuniary interest in the controversy.  This principle has been invoked to enable the United States to honor its treaty obligations to a foreign state.") (internal citations omitted).  Here, the United States moves to quash the writs at issue because the United States has significant foreign policy interests in ensuring that the statutory provisions governing foreign sovereign immunity are properly interpreted and applied and that the United States complies with its obligations under the Vienna Convention.  This interest is heightened by the risk that U.S. property abroad will be subject to reciprocal treatment.

Pursuant to domestic law and international treaties, the properties at issue are currently under the control of the Department of State, which has a legal duty and right to protect the properties.[9]  See infra; 22 U.S.C. §§ 4305(c), 4308(f); 23 U.S.T. 3227; 21 U.S.T. 77.  Thus, in Rubin v. Islamic Republic of Iran, 408 F. Supp. 2d 549 (N.D. Ill. 2005) (Mag. J. Ashman) --the only authority which plaintiffs cite in support of their position -- the court recognized that the United States is different from other third-parties, noting that "[t]he non-agent third party in Flatow, however, was the U.S. Government itself, which had standing to assert FSIA defenses because it took custody of and leased the Iranian properties in issue against Iran's wishes but pursuant to the Foreign Missions Act, 22 U.S.C. § 4305(c)."  Rubin, 408 F. Supp. 2d at 558; see also Roeder v. Islamic Republic of Iran, 195 F. Supp. 2d 140, 155 (D.D.C. 2002) ("Plaintiffs then argue that the United States lacks a cognizable interest because Iran has waived all defenses by refusing to appear in this court, and therefore the United States lacks standing to assert defenses on behalf of Iran. . . . Plaintiffs consistently mischaracterize the nature of the interest asserted by the United States.  The United States is not seeking to vindicate Iran's interests, but rather its own commitment under a binding international agreement, and its ever-present interest in the enforcement of its laws.").

---

[9] The Foreign Missions Act, 22 U.S.C. § 4311, states that "[t]he United States, acting on its own behalf or on behalf of a foreign mission, has *standing to bring or intervene in an action to obtain compliance with this chapter*, including any action for injunctive or other equitable relief."  22 U.S.C. § 4311 (emphasis added).  That chapter of the Foreign Mission Act includes § 4305 and § 4308, which provide that the Department of State shall protect and preserve diplomatic property after the foreign sovereign has ceased conducting diplomatic, consular and other governmental activities.

The United States has properly moved to quash writs of attachment with respect to the same properties in a number of instances, based on the significant interests of the United States that are implicated by such writs.  See infra Part C (citing authorities).  This case is no different.

As to their ability to attach the properties at issue, plaintiffs appear to argue that the properties are subject to attachment because:  (1) the recent amendments to the FSIA, specifically section 1610(g), create a new category of attachable foreign property which includes the properties at issue here; (2) the properties are otherwise attachable under FSIA section 1610; and (3) the properties are not being used for diplomatic purposes, and are therefore attachable under TRIA.  As set forth below, none of these avenues provides a supportable means of attaching the properties, which are immune under the FSIA, the Foreign Missions Act, and by virtue of the Vienna Convention.

## A.   Recently Added Section 1610(g) of the FSIA Does Not Permit Attachment of the Properties at Issue

Plaintiffs argue that section 1610(g) of the FSIA, which was recently added by the National Defense Authorization Act for Fiscal Year 2008 ("NDAA"), P.L. 110-181, section 1083 (January 28, 2008), "created a new special category of terrorist state property open to attachment," and that these changes "are specifically made applicable to pending cases by the amendment to 28 U.S.C. § 1610(f)(1)(A)."  Pl.'s Am. Supp. Mem., at 3.   Section 1610(g) provides, in relevant part:

**(g) Property in certain actions**.--

(1) **In general**.--Subject to paragraph (3), the property of a foreign state *against which a judgment is entered under section 1605A*, and the property of an agency or instrumentality of such a state, including property that is a separate juridical

entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment *as provided in this section*, regardless of--
(A) the level of economic control over the property by the government of the foreign state;
(B) whether the profits of the property go to that government;
(C) the degree to which officials of that government manage the property or otherwise control its daily affairs;
(D) whether that government is the sole beneficiary in interest of the property; or
(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

28 U.S.C.A. § 1610(g) (emphasis added).  Section 1610(g) does not provide for the attachment

of the properties at issue.   Section 1610(g) explicitly applies only to judgments "entered under

[28 U.S.C. §] 1605A."  Plaintiffs' judgment was not and could not have been entered under

section 1605A, as section 1605A was enacted several months after plaintiffs' judgment was

issued.  By its own terms, therefore, section 1610(g) is clearly inapplicable to plaintiffs and their

judgment. [10]

       Nor could section 1610(g) be made applicable via section 1610(f)(1), as plaintiffs argue,

because the President acted on the authority provided by 1610(f)(3) by waiving section

1610(f)(1) in its entirety.  See Pres. Determination No. 2001-03, 65 Fed. Reg. 66483 (2000) ("I

hereby waive subsection (f)(1) of section 1610 of title 28, United States Code, in the interest of

national security.").  Further, plaintiffs' assertion that the NDAA amendments are somehow

made applicable to their case has been unequivocally rejected by the recent D.C. Circuit opinion

in Simon v. Republic of Iraq, Nos. 06-7175, 06-7178, 2008 WL 2497417 (D.C. Cir., 2008),

---

[10]   Section 1083 of Public Law No. 110-81 provides for a 60-day time period for converting pre-existing actions brought under section 1605(a)(7) into actions under section 1605A. See P.L. 110-181, Div. A., Title X § 1083(c); 28 U.S.C. § 1605A note.  Plaintiffs have not attempted to convert their judgment as one under section 1605A, and the time in which they might have attempted to do so has elapsed.

which held that the NDAA amendments do not apply to cases brought under 28 U.S.C.

§ 1605(a)(7):

> [I]t is apparent that the 2008 amendments, including the "conforming amendments" that strike former § 1605(a)(7), see NDAA § 1083(b), do not apply to any claim then "pending" under that provision. . . . [O]nly a plaintiff prosecuting an action under new § 1605A of the FSIA can claim the benefits of that section, such as prejudgment attachment of the defendant's property.

Id. at *4 & note.  Accordingly, section 1610(g) does not permit attachment of the properties at

issue.

Even if plaintiffs had obtained a judgment "entered under section 1605A," section

1610(g) does not provide for the attachment of the properties at issue, because 1610(g) does not

create an independent exception to the immunity of foreign property.  Rather, it simply clarifies

that when the property of a foreign state or its agency or instrumentality "is subject to attachment

. . . *as provided in this section*," such attachment cannot be defeated by application of the five so-

called "Bancec" factors,[11] which the courts have traditionally relied upon in determining whether

a foreign government has a sufficient beneficial interest in the property to be attached.  Id.

(emphasis added).  By excluding verbatim the five Bancec factors from consideration in an

attachment proceeding otherwise provided for under section 1610, Congress merely sought to

---

[11]  In First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611 (1983) ("Bancec"), the Supreme Court explained that instrumentalities of a foreign state are presumed to have separate juridical status, which can be overcome by a showing of a principal-agent relationship, or where such a separate status would work fraud or injustice.  Id. at 629. Several courts have distilled five factors from Bancec to be considered:  "(1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations."  Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines, 965 F.2d 1375, 1381 (5th Cir. 1992); see also Flatow v. Islamic Republic of Iran, 308 F.3d 1065, 1070-71 & n. 9 (9th Cir. 2002) (same).  These factors are recited in new section 1610(g)(1)(A) - (E).

eliminate the application of <u>Bancec</u>.  Unless the properties would be otherwise attachable under Section 1610, which they are not, no attachment is permissible.

The legislative history of the NDAA amendments confirms that this section was designed to allow attachment of foreign property notwithstanding the specific degree of control that the foreign government has over such property, but that Congress continued to intend that diplomatic properties be exempt from attachment.  <u>See</u> H. Rept. 110-477, Conference Report to Accompany H.R. 1585, NDAA, at 1001, attached hereto as Exhibit 2 (stating that the new amendments permit "any property in which the foreign state has a *beneficial ownership* to be subject to execution" but that "[t]he conferees intend that property used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of Mission, *which is not subject to execution or attachment in aid of execution of a judgment*, should not be subject to a lien of lis pendens under this provision.") (emphasis added). Thus, this new subsection does not, as plaintiffs contend, create an independent exception to the attachment of foreign property, and it certainly does not provide for the attachment of foreign diplomatic property.

**B.      The Properties are Not Subject to Attachment Under Section 1610 of the FSIA**

As section 1610(g) does not apply to this case and does not provide an independent means of attaching foreign property, the properties must fall within one of the other exceptions under section 1610 in order to be attachable via the FSIA.  Plaintiffs appear to allege that the properties are attachable under sections 1610(a)(7) and 1610(f)(1).[12]

In order to be attachable under section 1610(a)(7), the foreign property must be "used for a commercial activity" in the United States.  It is the foreign state's own activities, not those of

---

[12] Plaintiffs concede that the exception created by section 1610(b) is not applicable in this case.  Pls. Supp. Mem., at 7, Rec. Doc. No. 23.  Further, the remaining exceptions under section 1610 are not relevant here.

the United States, that determine whether the particular property is "used for a commercial activity" within the meaning of section 1610(a).  See Flatow, 76 F. Supp. 2d at 23.   As the Supreme Court stated in discussing the waiver of jurisdictional immunity in the FSIA in Republic of Argentina v. Weltover, 504 U.S. 607 (1992), actions are "commercial" within the meaning of the FSIA "when *a foreign government acts*, not as regulator of a market, but in the manner of a private player within it."  Id. at 614 (emphasis added).  "[T]he issue is whether the particular actions that *the foreign state performs* . . . are the type of actions by which a private party engages in 'trade and traffic or commerce[.]'"  Id. (emphasis added).  This interpretation comports with the rationale behind the FSIA's exceptions to jurisdictional immunity and attachment and execution immunity -- a foreign state should be found to have waived these immunities only when *it* has taken some action outside the realm of sovereign actions and itself acts as a private party.

Here, assuming *arguendo* that section 1610(a)(7) is available in this case,[13] the properties at issue are not being "used for a commercial activity" by Iran, which has not possessed or used the properties since diplomatic relations between the United States and Iran were severed in 1980.  And, as this Court held in Flatow, the actions of the Department of State in connection with any renovation and rental of the same diplomatic properties at issue in this case did not constitute "commercial activity" by the foreign state so as to bring section 1610(a)(7) into play.  See 76 F. Supp. 2d at 22-24.  Thus, these properties are not attachable via section 1610(a)(7).

Section 1610(f)(1) may have provided an alternate means for attachment of property, but plaintiffs cannot rely on this section here, as it was waived by the President.  See Pres. Determination No. 2001-03, 65 Fed. Reg. 66483.  Plaintiffs state that this "waiver power held by

---

[13]  See 28 U.S.C. § 1610(a)(7) (as amended).

the President to issue a wavier was repealed by [TRIA], which applies specifically to the property in question here, by exempting it from the President's waiver power." This argument is untenable. First, as explained below, TRIA does not apply to the properties in question because these properties are not "blocked assets" as defined by TRIA. See infra Part C. Furthermore, the waiver authority provided under section 1610(f)(3), and the waiver executed thereto, continue to be in effect today, notwithstanding the passage of TRIA. TRIA created a mechanism, separate and apart from section 1610(f)(1), by which judgment holders may attach foreign property. See, e.g., Weininger v. Castro, 462 F. Supp. 2d 457, 486-87 (S.D.N.Y. 2006) ("TRIA thus expressly provides that where a judgment against a terrorist party exists, not only its assets, but the assets of its agencies and instrumentalities can be used to satisfy the judgment. In contrast, § 1610(f)(1)(A) states that if a creditor seeks to execute on assets claimed by an agency or instrumentality of a foreign state, that agency or instrumentality must already not be 'immune under § 1605(a)(7).'"). TRIA did nothing to amend, repeal, or otherwise modify section 1610(f)(3). Accordingly, and as has been recognized by various courts, TRIA left unchanged the waiver authority provided by 1610(f)(3), and the waiver that was executed by President Clinton continues to render section 1610(f)(1) inoperable. See, e.g., Ministry of Defense and Support for Armed Forces of Islamic Republic of Iran v. Cubic Defense Systems, Inc., 495 F.3d 1024, 1032 (9th Cir. 2007) (noting that "TRIA's text does not expressly reinvigorate § 1610(f)(1)(A) from President Clinton's waiver"); Weininger, 462 F. Supp. 2d at 486-87 (describing differences between TRIA and section 1610(f)(1), and noting that section 1610(f)(1) was waived by the president); Smith v. Federal Reserve Bank of New York, 280 F. Supp. 2d 314, 317 & n.3 (S.D.N.Y.2003) (finding that plaintiffs could not rely on section 1610(f)(1) to attach property because that section had been waived by the president, and separately finding that attachment

under TRIA was also impermissible).  Thus, plaintiffs cannot rely on section 1610(f)(1) to attach the property at issue.

## C.   The Properties at Issue are Not "Blocked Assets" as Defined by TRIA and Therefore are Not Subject to Attachment Under TRIA Section 201(a)

As set forth above, in addition to the exceptions under the FSIA, TRIA provides another mechanism for attaching certain foreign property in aid of execution of a judgment.  Section 201(a) of TRIA provides that "blocked assets" of a terrorist party shall be subject to attachment in aid of execution of a judgment on a claim that is based upon an act of terrorism.  Pub. L. No. 107-297.  Section 201(d) of TRIA then states that "blocked assets" do not include property that:

> [I]n the case of property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, or that enjoys equivalent privileges and immunities under the law of the United States, is being used exclusively for diplomatic or consular purposes.

Section 201(d)(2)(B)(ii).[14]

The five parcels of real property at issue fall within this exception to TRIA's definition of "blocked assets."  First, the properties are "subject to the Vienna Convention on Diplomatic Relations."  Under the Vienna Convention, the United States is required to "respect and protect the premises of the mission, together with its property and archives" even after diplomatic relations have been severed.  See Article 45 of the Vienna Convention on Diplomatic Relations.  Second, these real properties are "being used exclusively for diplomatic or consular purposes" by the United States.  The United States' obligations under the Vienna Convention include the duty

---

[14]   Section 201(d)(3) of the TRIA defines "property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations" as property, "the attachment in aid of execution or execution of which would result in a violation of an obligation of the United States under [either of the] Vienna Convention[s]."

to protect and maintain diplomatic properties.[15]  See Nebel Decl. ¶¶ 10-12.  Accordingly, since

the break in diplomatic relations with Iran, the United States has undertaken to protect the

specific properties at issue pursuant to the Vienna Convention and the Foreign Missions Act.[16]

See Nebel Decl. ¶¶ 4, 12.  As the Nebel Declaration explains, OFM has determined that the

United States, as the receiving State, may appropriately discharge its obligation under the Vienna

Convention to protect the property, by ensuring (to the extent possible) that the properties are

occupied and generating income needed for their own maintenance and repair.  See id. ¶ 11.

Consequently, over the years OFM has leased some of the properties, and has used some of the

proceeds for maintenance costs.  See id. ¶ 12, 14-19.  Remaining proceeds have been deposited

in a blocked Iranian diplomatic account, and are not used for any other purposes.  See id. ¶ 12.

The United States' purpose in protecting certain foreign properties pursuant to its

international obligations, and any of its specific efforts pursuant to that purpose, have been

---

[15]  The United States notes that courts must give great weight to the Executive Branch's interpretation  of the Vienna Convention.  See Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184-85 (1982); Kolovrat v. Oregon, 366 U.S. 187, 194 (1961).

[16]  Plaintiffs' writs each purport to be directed at "The Islamic Republic of Iran and Person In Possession Of The Below Described Real Property."  Although these writs were never served on the United States or its agencies, as this Court has previously held, property in the custody or possession of the United States is subject to the United States' sovereign immunity. See, e.g., Weinstein v. Islamic Republic of Iran, 274 F. Supp. 2d 53, 57-58 (D.D.C. 2003); Flatow v. Islamic Republic of Iran, 74 F. Supp. 2d 18, 21 (D.D.C. 1999).  Plaintiffs point to 28 U.S.C. § 1610(g)(2) as providing a waiver of that immunity.  That section is inapplicable to these proceedings because, as with § 1610(g)(1), see supra at 14-15, it only applies to judgments entered under § 1605A, which plaintiffs' judgment was not.  In any event, nothing in section 1610(g)(2) prevents the United States from protecting foreign diplomatic properties in its custody as is required by the Foreign Missions Act and the Vienna Convention.  Plaintiffs point to no other waiver of the United States' sovereign immunity that would allow execution of a writ, or any other compulsory judicial process, against the United States in the circumstances of this case.  See Flatow, 76 F. Supp. 2d at 23 (noting that the United States' custody of diplomatic properties is a "sovereign" function).

deemed by various courts as use of the property that is "exclusively for diplomatic or consular

purposes" under section 201(d)(2)(B).  As one court explained:

> The United States has an international legal obligation under the Vienna
> Conventions to protect foreign missions, consular premises, and their property in
> the United States in the event that diplomatic relations between the United States
> and a foreign country are severed.   The conventions recognize that diplomatic
> properties belong to the state that established them, not to the government that
> controls the state.  The conventions also recognize that host states have the duty to
> hold in trust for future generations the diplomatic properties of a state with whom
> they have a dispute, however severe and violent, that has caused the severance of
> diplomatic relations.   As treaties into which the United States has voluntarily
> entered, the conventions are part of the fundamental fabric of the nation's law.
> *Likewise, the goal of assuring that the United States is in compliance with its
> treaty obligations is quintessentially "diplomatic."   Therefore, in protecting the
> subject properties the United States clearly is using them for a "diplomatic
> purpose."*

Hegna v. Islamic Republic of Iran, 287 F. Supp. 2d 608, 610 (D. Md. 2003) (emphasis added);

see also Mousa v. Islamic Republic of Iran, No. 00-2096 (D.D.C. Nov. 5, 2003) (attached hereto

as Exhibit 3) (finding that three parcels of real property formerly associated with the Iranian

diplomatic mission -- including two of the properties in this case -- were immune from

attachment under  TRIA because in "protecting and maintaining the properties the United States

[was] fulfilling its duties under international diplomatic law," and therefore "the property is

being used for diplomatic or consular purposes"); Elahi v. Islamic Republic of Iran, No. 99-

02802 (D.D.C. July 22, 2003) (attached hereto as Exhibit 4) (granting United States' motion to

quash writs on the same three properties at issue in Mousa v. Iran, because "an attachment of

these real properties by plaintiffs would result in a violation of an obligation owed by the United

States pursuant to the two Vienna Conventions"); Hegna v. Islamic Republic of Iran, 376 F.3d

485, 495-96 (5th Cir. 2004) (finding that foreign property formerly used as the residence of the

General Consul of Iran was immune from attachment under TRIA because the property was

being used by the United States "exclusively for diplomatic or consular purposes" under section 201(d)(2)(B), where the United States was leasing the properties and using a portion of the funds to maintain and preserve the property pursuant to its diplomatic obligations under the Vienna Conventions).  Thus, the purpose of the United States in protecting the properties at issue, including in renting out the properties where feasible, constitutes a "diplomatic purpose," under section 201(d) of the TRIA.[17]  Therefore, the properties are not blocked assets, and are not subject to attachment under TRIA.

* * *

As neither the FSIA exceptions nor TRIA applies to the properties at issue, the FSIA and the Foreign Missions Act prohibit the attachment of the real properties.  The real properties are immune from attachment pursuant to these provisions because the properties were used in the past by the Iranian government for diplomatic activities and they are now being maintained and/or leased by the Department of State pursuant to the United States' duties under the Vienna Convention to preserve such diplomatic property.

**CONCLUSION**

For the reasons provided above, the Court should quash the plaintiffs' writs in their entirety.

---

[17] The fact that some of the properties are not currently occupied does not render them attachable under TRIA.  As the cases indicate, it is the United States' "diplomatic purpose" in protecting the property from interference that makes the property immune from attachment, not the means it takes in effectuating that purpose.  See, e.g., Hegna; 287 F. Supp. 2d at 610. Further, as explained in the Nebel Declaration, and as is shown in the jurisprudence involving some of the exact properties at issue, OFM has taken efforts to periodically lease the properties where feasible.

Respectfully submitted this 18th day of July, 2008.

GREGORY G. KATSAS
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

JOSEPH H. HUNT
Director, Federal Programs Branch

VINCENT M. GARVEY
Deputy Director, Federal Programs Branch

/s/ *Varu Chilakamarri*
VARU CHILAKAMARRI (NY Bar)
Trial Attorney, Federal Programs Branch
U.S. Department of Justice, Civil Division
Tel: (202) 616-8489
Fax: (202) 616-8470
varudhini.chilakamarri@usdoj.gov
Courier Address:
20 Massachusetts Ave., NW, Rm. 7226
Washington, D.C. 20530

*Counsel for the United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2008, a true and correct copy of the foregoing was served

electronically by the U.S. District Court for the District of Columbia Electronic Document Filing

System (ECF) and that the documents are available on the ECF system.

 /s/ *Varu Chilakamarri*
VARU CHILAKAMARRI