THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MICHAEL BENNETT | ) | |
| and LINDA BENNETT | ) | |
| Individually and as Co-Administrator | ) | |
| of the Estate of MARLA ANN BENNETT | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | **03-CV-1486 (RCL)** |
| | ) | |
| v. | ) | |
| | ) | |
| THE ISLAMIC REPUBLIC OF IRAN, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

The United States has moved to quash five writs of attachment issued against properties

belonging to the Islamic Republic of Iran. Dk. # 34. These properties largely comprise the

former Iranian Embassy compound here in Washington, D.C. This includes the former

Ambassador's residence, Iran's former Embassy Chancery, as well as a separate diplomatic

residence, and two parking lots.[1] Plaintiffs obtained the writs attaching these properties of Iran

---

[1] The five properties at issue are identified as 3003 Massachusetts Avenue, NW; 3005
Massachusetts Avenue, NW; 3410 Garfield Street, NW; Lot 8, Square 2145, NW; and Lot 0820,
Square 2145, NW. *See* Dk. #s 26-31. These five properties are described in some detail in the
written declaration of Mr. Claude J. Nebel, dated July 11, 2008. *See* Dk. # 34, Exh. 1. At the
time of the declaration, Mr. Nebel was Deputy Assistant Secretary for Diplomatic Security and
Deputy Director of the Office of Foreign Missions for the State Department. The United States
relies on Deputy Assistant Secretary Nebel's declaration in support of its motion to quash the
five writs of attachment. According to the declaration: The property at 3003 Massachusetts
Avenue, NW was the residence of Iran's Ambassador. The property at 3500 Massachusetts
Avenue, NW served as the Embassy Chancery. The property at 3410 Garfield Street, NW was
used as a diplomatic residence of the Embassy. The properties identified as Lot 8, Square 2145,
NW and Lot 0820, Square 2145, NW were both part of the Iranian Embassy compound and
functioned primarily as parking lots for the Iranian Embassy. Iran owns all the properties at

in an effort to satisfy a judgment they received in an action pursuant to the 28 U.S.C. §

1605(a)(7), the state sponsor of terrorism exception to sovereign immunity. *See* Dk. #s 20-22.

For the reasons expressed herein, the Court will grant the Government's motion to quash the

writs of attachment.


**Facts and Procedural History**

  Marla Ann Bennett, an American citizen and resident of California, was just 24 years old

when she was murdered by terrorists. She was killed when Hamas operatives detonated a bomb

inside a cafeteria at the Hebrew University in Jerusalem in July of 2002. In an effort to achieve

some measure of justice, Marla's parents brought a civil action against Iran and its Ministry of

Information and Security (MOIS) under § 1605(a)(7). The Bennetts demonstrated through

evidence satisfactory to this Court, *see* § 1608(e), that Iran and its MOIS provided material

support to Hamas in furtherance of terrorist objectives. *See Bennett v. Islamic Republic of Iran*,

507 F. Supp. 2d 117 (D.D.C. 2007) (Lamberth, J.). Plaintiffs were awarded a judgment in excess

of 12 million dollars. To date, that judgment remains unsatisfied.

  In an effort to execute their judgment against Iran, plaintiffs procured the writs of

attachment on the properties at issue in this case. Due to the manner in which plaintiffs attached

these former diplomatic properties, however, this matter has a strange and somewhat tortured

procedural history. Contrary to the usual procedure for the issuance of writs attachment, in

which the request is handled directly by the Clerk's office in accordance with long-standing

procedures established by this Court, plaintiffs' counsel instead filed a separate motion

———————————

issue and the majority of them were purchased by the Government of Iran in 1959.

requesting that this Judge specifically order the Clerk of Court to issue the five writs. *See* Dk. #

22. Plaintiffs' counsel later filed a supplemental memorandum in support of the motion for writs

of attachment. *See* Dk. # 24. In that memorandum, counsel observes that in *Flatow v. Islamic*

*Republic of Iran* this Judge quashed five writs of attachment on some of the very same properties

at issue here. *See* Dk. # 24 at p. 2 (citing 76 F. Supp. 2d 16 (D.D.C. 1999) (Lamberth, J.))[2]

Counsel argues, however, that both the relevant facts and the applicable law have changed since

that decision in *Flatow* and, as a result of those changes, Iran's properties here in Washington are

no longer immune from attachment. *See id* at 2-7.

At the time plaintiffs' supplemental memorandum was filed, the United States had not

yet entered an appearance in this action, let alone moved to quash plaintiffs' writs of attachment.

Nonetheless, plaintiffs' counsel suggests in his supplemental memorandum that the United States

does not have standing to move this Court to quash writs of attachment issued against Iran's

former embassy properties, notwithstanding the fact that it was the United States that

successfully moved to quash the writs in *Flatow*. *See* Dk. # 24, p. 7-10. Counsel's argument

relies heavily – if not exclusively – on *Rubin v. Islamic of Iran*, a case from the Northern District

of Illinois in which the court held that the University of Chicago did not have standing to

challenge writs of attachments issued against collections of Persian artifacts on loan to the

---

[2] The decision in *Flatow* involved three of the properties at issue today -- 3003 Massachusetts Avenue, NW, 3005 Massachusetts Avenue, NW, and 3410 Garfield Street, NW – as well as one other Iranian property, 2954 Upton Street, NW. *See* 76 F.Supp. 2d at 19, n.3. Just four years later, this Judge again quashed writs of attachment on those very same properties and issued a short, unpublished opinion in the matter. *See Elahi v. Islamic Republic of Iran, 99-cv-02802* (D.D.C. 2003) (Lamberth, J.).

university from Iran. *See id* (citing 408 F. Supp. 2d 549 (N.D. Ill. 2005)).[3]

Plaintiffs' counsel ultimately withdrew his motion for an order to issue of writs of attachment, but the writs of attachment were issued by the Clerk of the Court about a week later on April 1, 2008. *See* Dk. # 26. Counsel subsequently filed executed returns on the writs on June 5, 2008. *See* Dk. #s 27-31. Accordingly, the record suggests that the plaintiffs' counsel withdrew the motion in order to procure the writs through the Clerk's office in accordance with the normal and long-established procedures of this Court. While this Court normally does not consider motions or other matters that have been withdraw by counsel, this Court will nonetheless accept the withdrawn motion and supplemental memorandum for the limited purpose of establishing that counsel believed he had some good faith basis for procuring writs of attachment against former diplomatic properties of Iran.

Undeterred by plaintiffs' peremptory arguments, the United States moved to quash all five writs of attachment on July 18, 2008. *See* Dk. # 34. Plaintiffs filed their opposition in a timely manner and the United States timely filed its reply. *See* Dk. #s 35 & 36. More than two months later, however, and without leave of the Court, plaintiff filed another supplemental memorandum and several exhibits as additional support for their opposition to the Government's motion to quash. Dk. # 37. The Government then filed a response to the plaintiffs' supplemental memorandum four days later on October 21, 2008. *See* Dk. # 40. In that response,

---

[3] Counsel also included the following rhetoric: "The argument that pandering to a terrorist is in the best interest of the United States falls on the sale of reason somewhere between illogical and insulting. We would all hope that there is no close relationship between any American Administration and the world's leading supporter of terrorism." Dk. 24 at p. 10. Perhaps such rhetoric was intended to deter the United States from getting involved in this litigation. At any rate, it seems uncessary and, as will be emphasized below, completely mischaracterizes the nature of the interests the United States has at stake in these matters.

the Government requests that plaintiffs' supplemental filing be struck from the record or disregarded.

## Arguments of the Parties

### *The United States*

The United States argues that plaintiffs' writs of attachment must be quashed because the properties at issue are immune from attachment in light of several important legal authorities. The United States calls this Court's attention to the Vienna Convention on Diplomatic Relations (Vienna Convention), 23 U.S.T. 3227, T.I.A.S. No. 7502 (1972), the Foreign Missions Act, 22 U.S.C. §§ 4301, *et seq.*, the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § § 1602, *et. seq.*, the Terrorism Risk Insurance Act (TRIA), Pub. L. No. 107-297, Title II, § 201 (Nov. 26, 2002), codified as 28 U.S.C. § 1610 Note, and several Executive Orders and Federal Regulations relating to properties belonging to Iran in the United States. *See* Dk. #34. The Government emphasizes that the United States is now holding the former diplomatic properties of Iran in protective custody pursuant to the terms of the Foreign Missions Act and consistent with the Federal Government's obligations under the Vienna Convention. *See Id* at p. 1, 8-10, Exh. 1. The United States claims that, in order to fulfill its responsibilities under the Vienna Convention and Foreign Missions Act, the State Department's Office of Foreign Missions (OFM) has periodically leased Iran's properties to other foreign governments or to private parties and has used the income derived from those rentals to fund necessary maintenance and repairs of the properties. *See* Dk. 34 at p. 10.

In light of its multilateral treaty and statutory obligations, as well as the overall

importance of the foreign policy interests presented here, the United States stresses that it

therefore has at least two independent bases on which it may assert standing in this action.  First,

the Government relies on 28 U.S.C. § 517, which vests the Attorney General with broad

authority "to send any officer of the Department of Justice to 'attend to the interests of the

United States in a suit pending in a court of the United States.'" *Id* at p. 11.  Second, the United

States argues that, regardless of the scope of any statutory authority provided under 28 U.S.C. §

517, long-standing case precedent establishes that the Federal Government has standing to assert

and protect its own important foreign policy interests.  *See Id.*  *See also* Dk. # 36 at p. 1-5.

The Government observes that on at least two prior occasions this Court determined that

the very properties at issue here are immune from attachment. *See Id* at p. 20-21 (citing *Flatow*,

274 F. Supp. 2d 18; *Mousa v. Islamic Republic of Iran*, 00-cv-2096 (D.D.C. 2003) (Bryant, J.)).

According to the Government there's been no subsequent change in the applicable facts or law

the would render those properties subject to attachment now. *See id.* at 13-21; Dk. # 36, p. 6-7.

In particular, the Government emphasizes that Congress did not intend that the enactment of §

1083 of the 2008 NDAA and the new state sponsor of terrorism exception 1605A to allow for the

attachment of diplomatic properties. *See* Dk. # 34 at p.13-16.

Finally, the Government asks that this Court strike or otherwise disregard plaintiffs

supplemental filings in this matter. *See* Dk. # 40.  The United States emphasizes that the

supplemental materials were filed in contravention of the local rules without leave of the Court,

and that, in any event, the materials are not relevant to this dispute.  *See id.*

### Plaintiffs Michael and Linda Bennett

Plaintiffs' primary argument is the United States does not have standing to challenge the writs of attachment issued against Iran's former diplomatic properties. *See* Dk. 35 at p. 1-5.  In plaintiffs' brief that is heavy on rhetoric, counsel is largely dismissive of the United States' position, asserting that it is "insulting to the intelligence of the American people." *Id* at  p. 4. Plaintiffs' counsel cast the United States as effectively mounting a defense of Iran, and argues that the United States should be precluded from doing so in this case because Iran has proven more than capable of defending itself in actions in this district and in other federal courts throughout the country. *Id* at 2-5.  Counsel again relies on *Rubin v. Islamic Republic of Iran*, a case pending in Chicago in which the federal district court there determined that certain private litigants – the University of Chicago and others – do not have standing to assert sovereign immunity in an action in which certain judgment-creditors of Iran are seeking attachment or execution of certain artifacts on loan from Iran to the University of Chicago. *See* Dk. 35 at p. 2-5.

On the merits, plaintiffs claim that neither the Vienna Convention nor the Foreign Missions Act precludes attachment of properties once used for diplomatic purposes when, as here, the United States and the foreign nation no longer maintain formal diplomatic relations and the properties at issue are unoccupied and have fallen into disuse and disrepair. *See id*. at p. 5-8. Indeed, counsel alleges that the former embassy properties at issue in this case are currently in such a state of disuse and disrepair that the properties are not capable of being used for diplomatic purposes and therefore offer nothing more than investment value. *See id* at p. 6-9. Moreover, plaintiffs suggest that to the extent that the State Department might have either the

legal obligation or the authority to assert custody and control over a foreign mission properties,

the current state of disrepair of Iran's former embassy properties shows that the United States

has completely abdicated its responsibility in this case. Accordingly, in plaintiffs' view, the

properties should now, at a minimum, be subject to attachment under the commercial activities

exception to the FSIA. *See id* at 7-10.

Plaintiffs also assert that, regardless of whether Iran's properties in this case might

ordinarily be entitled to diplomatic protection or some other immunity from attachment, recent

changes to the FSIA – specifically, the sweeping changes enacted through § 1038 of the NDAA

last year – render diplomatic properties of state sponsors of terrorism subject to attachment and

execution. Plaintiffs argue that for the purpose of attaching Iran's property, it does not matter

that their action falls under the prior version of the state sponsor of terrorism exception, §

1605(a)(7), rather than § 1605A, because in plaintiffs' view, the new law simply strips away any

immunity from attachment or execution that the diplomatic properties of terrorist nations might

have otherwise enjoyed.

More than two months after the conclusion of briefing on this matter, plaintiffs filed a

supplemental memorandum and exhibits in an apparent effort to bolster their position that the

properties Iran once used for its embassy here in Washington are no longer immune from

attachment. *See* Dk. # 37. The memorandum, which was filed without leave of the Court,

summarizes plaintiffs' failed attempts to obtain information from the Department of State

regarding the leasing and maintenance of the properties as issue, as well as other information

concerning discussions between the United States and Iran regarding the status of Iran embassy

properties.[4]

The remainder of the supplemental memorandum simply summarizes the testimony

provided in two supplemental exhibits. The first exhibit is a transcript of deposition testimony of

a witness who claims that the former United States embassy in Tehran, Iran has been used as a

school for Iran's Revolutionary Guards sometime within the last three years. *See* Dk. # 37 at p.

3 & Exh. F. The relevance of this testimony is not apparent and no explanation is proffered by

plaintiffs' counsel. Perhaps plaintiff means to suggest that Iran is in material breach of its

obligations under the Vienna Convention, and that therefore the United States is no longer

obligated to protect Iran's former diplomatic properties here in the United States. The second

exhibit included with the supplement is a transcript of deposition testimony of a witness who

claims he is a construction worker who once worked on the buildings located on the properties

now subject to plaintiffs' writs of attachment. *See* Dk. # 37 at p. 3 & Exh. G. The witness'

testimony largely supports plaintiffs' assertions that former diplomatic properties are not

currently in use and have fallen into various states of disrepair.[5]

---

[4] Plaintiffs issued a subpoena to the State Department for this information, but the Department, by written letter, declined to comply. *See* Dk. # 37. The Department noted, among other objections, that plaintiffs' subpoena is procedurally defective, unduly burdensome, and that the information requested is irrelevant to this dispute. *See* Dk #37 & Exh. 4; Dk. 40 at p. 3-4. For the reasons discussed below, this Court finds that the information plaintiffs requested from the Department of State is irrelevant to the issue of whether this Court must quash the writs of attachment.

[5] In summarizing the relevance of the construction worker's testimony, counsel states as follows:

> The testimony demonstrates that the buildings located on the properties at 3003 Massachusetts Avenue, 30005 Massachusetts Avenue and 3410 Garfield Street are not in use at all and therefore have value only as investment property. The other pieces, never legally joined to the real property on which the three buildings at those

9

This Court will address each of the arguments of the parties in turn.  Before proceeding to analysis of those arguments, however, the Court believes it is important to provide the legal and factual backdrop that is essential to an understanding of the issues involved in this dispute. A decade has passed since this Court first ruled, in the case of *Flatow v. Islamic Republic of Iran,* that the former embassy properties at issue here today are not subject to attachment and execution under the FSIA.  Both plaintiffs and the United States have identified a number of developments in the law relating to this matter since that decision.  While this Court is not convinced that there is has been any change in the law that would require a different outcome in this case, it is with sincere respect for the plaintiffs in this action, that this Court will briefly review the controlling legal authorities, as well as the key facts concerning diplomatic relations between the United States and Iran, in order to examine carefully whether the relief denied to the Flatows ten years ago should be available to the Bennetts today

**Discussion of Legal and Factual Background Concerning the Former Iranian Embassy Properties here in Washington, D.C.**

There are basically five sources of law that are central to the resolution this dispute.  The first source of law that undergirds this whole matter is the Vienna Convention on Diplomatic Relations.  The second is the Foreign Missions Act, which in certain critical respects serves to

---

> addresses above were located, were vacant lots and never had any known use and therefore could not be diplomatic property in accordance with Article 22 of the Vienna Convention on Diplomatic Relations.  The properties are not exempt from attachment upon the judgment entered against Defendant, Iran.
>
> Dk. # 37 at p. 4.

implement the United States' obligations under the Vienna Convention.  The third source is the

Foreign Sovereign Immunities Act, § § 1609, 1610, including the key amendments made

pursuant to the Terrorism Risk Insurance Act, which furnishes a number of exceptions to the

general rule that the property of a foreign sovereign is immune from attachment or execution.

The fourth key source of law in this sensitive foreign relations matter is the Executive Branch's

official actions in response to the breakdown in diplomatic relations with Iran.  This source of

legal authority includes both Executive Orders and statements issued by the United States to Iran

regarding the status of its mission properties here in the United States.  Fifth, and finally, this

Court will review the few decisions of this Court and others that have addressed the issue of

whether Iran's properties that are no longer being used by Iran for diplomatic purposes should

now be subject to attachment in execution in satisfaction of court judgments.  A review of all

five of these sources demonstrates that the laws of the United States do not permit this Court to

sustain plaintiffs' writs of attachment.


### *(1) The Vienna Convention*

In 1972, the United States ratified the Vienna Convention on Diplomatic Relations.  23

U.S.T. 3227, T.I.A.S. No. 7502.  Under the terms of that treaty, the United States, in its role as a

receiving state of foreign missions, is obligated to protect and respect the premises of any foreign

mission located within its sovereign territory.  Article 22 of the Convention outlines the basic

responsibilities of a receiving state with respect to the property of a foreign mission.  That

Article provides that the property of a foreign mission is "inviolable," and thus the receiving

state is under a "special duty to take all appropriate steps to protect the premises of the mission

against any intrusion or damage." Moreover, "[t]he premises of the mission, their furnishings and other property thereon and the means of transport of the mission *shall be immune* from search, requisition, *attachment, or execution.* Article 22(3) (emphasis added).

Article 45 of the Vienna Convention makes clear that the obligation to protect and respect the premises of a foreign mission survives even in cases in which diplomatic relations are broken off, or in cases in which the mission is permanently recalled, and even during instances of armed conflict. Article 45 states as follows

> If diplomatic relations are broken off between two States, or if a mission is permanently or temporarily recalled:
>
> (a) the receiving State must, even in case of armed conflict, respect and protect the premises of the mission, together with its property and archives;
>
> (b) the sending State may entrust the custody of the premises of the mission, together with its property and archives, to a third State acceptable to the receiving State;
>
> (c) the sending State may entrust the protection of its interests and those of its nationals to a third State acceptable to the receiving State.

Thus, even during periods in which the United States is experiencing an extremely strained or outright hostile relationship with a foreign nation, the United States remains obligated to protect that nation's diplomatic properties.

### (2) The Foreign Missions Act

The Foreign Mission Act, 22 U.S.C. § § 4301, *et seq*, vests the Department of State with broad authority to make determinations with respect to the treatment accorded to foreign missions here in the United States. *Palestine Information Office v. Shultz*, 853 F.2d 932, 936 (D.C. Cir. 1988). Specifically, 22 U.S.C. § 4301(c) provides that:

12

> The treatment to be accorded to a foreign mission in the United States shall be
> determined by the Secretary after due consideration of the benefits, privileges, and
> immunities provided to missions of the United States in the country or territory
> represented by that foreign mission, as well as matters relating to the protection of
> the interests of the United States.

The State Department "acts at the apex of its power" when it exercises its authority over foreign missions here in the United States because "it wields the combined power of both the executive and legislative branches." *Palestine Information Office*, 853 F.2d at 937.

The foreign Mission Act expressly authorizes the Secretary of State to protect the properties of foreign missions here in the United States even when those properties are not being being used by a foreign power. Specifically, the Secretary of State may "protect and preserve property of a foreign mission" when that "foreign mission has ceased conducting diplomatic, consular, and other governmental activities in the United States and has not designated a protecting power or other agent approved by the Secretary to be responsible for the property of that foreign mission." § 4305(c). Thus, the former diplomatic properties here in the United States are ultimately subject to the authority and control of the Secretary of State.

The Office of Foreign Missions (OFM) is the arm of the State Department that acts pursuant to the Secretary of State's broad authority with respect to treatment and oversight of foreign mission properties, including former diplomatic properties located here in the United States. *See* 4303; Dk. 34, Exh. 1 at p. 1-2. Consistent with the Vienna Convention, the Foreign Mission Act also provides that foreign mission property within the control of the Department State is not subject to attachment or execution. Section 4308(f) provides as follows:

> Assets of or under the control of the Department of State, wherever situated, which
> are used by or held for the use of a foreign mission *shall not be subject to
> attachment, execution*, injunction, or similar process, whether immediate or final

(emphasis added).

Accordingly, the Foreign Mission Act reinforces the basic understanding that properties of a foreign mission, including those that are not currently being used by a foreign mission, are generally immune from attachment or execution.

### (3)   *Foreign Sovereign Immunities Act, § § 1609, 1610, Including Provisions Incorporated by the Terrorism Risk Insurance Act*

The Foreign Sovereign Immunities Act, provides that the property of a foreign state is generally immune from attachment or execution subject to a few, carefully delineated exceptions. *See* 28 U.S.C.  § § 1609, 1610.  The exceptions to that immunity are found in § 1610.  One well-established exception to the general rule of immunity from attachment or execution is the so called "commercial activity" exception.  *See* § 1610(a)(7); *Republic of Argentina v. Weltover*, 504 U.S. 607 (1992).  That exception provides that the property of a foreign state is *not* immune from attachment or execution if the property at issue "is used for a commercial activity" by the foreign state.  § 1610(a)(7).

Congress has enacted an exception to immunity for any property belonging to designated state sponsors of terrorism.  *See* Pub. L. 105-277, Div. A., Title I, §. 117 (October 21, 1998)..  That exception – now codified as § 1610 – would otherwise permit the attachment of blocked assets of terrorist states, including former diplomatic properties, but Congress gave the President express authority to waive the exception in the interest of national security, and the President promptly executed the waiver upon signing the legislation into law.  *See* Pres. Determination No. 99-1, 63 FR 59201. (1998).

A term later, Congress attempted to override the President's waiver of § 1610(f) in the

14

Victims of Trafficking and Violence Protection Act (VTVPA) of 2000.  *See* Pub. L. 106-386, §

2002, 114 Stat. 1541 (October 28, 2000), but Congress again included in the legislation

express authority for the President to waive § 1610(f).  The President immediately waived

§ 1610(f)(1)(A) a second time upon signing the VTVPA into law, and thus § 1610 remains a

nullity.  *See* Pres. Determination No 2001-03, 65 Fed. Reg. 66483 (2000).

Congress and the President eventually reached an agreement with respect to the

attachment and execution of certain blocked assets of terrorist states, and enacted the

Terrorism Risk Insurance Act (TRIA) in 2002, a law that permits terrorism victims with

judgments under § 1605(a)(7) to satisfy their judgments for compensatory damages from

"blocked assets of terrorists, terrorist organizations, and State sponsors or terrorism."  *See*

Pub.L. No. 107-297, Title II, 201 (Nov. 26 2002); now codified as 28 U.S.C.  § 1610 Note.

Specifically, Section 201 of the TRIA provides that the blocked assets of a terrorist state

*shall be subject to execution or attachment in aid of execution to satisfy such judgment to the*

*extent of any compensatory damages for which such terrorist party has been adjudged liable*

(emphasis added).

The definition of "blocked assets" under the TRIA, however, expressly excludes

"property subject to Vienna Convention on Diplomatic relations, or that enjoys equivalent

privileges and immunities under the law of the United States, being used for exclusively for

diplomatic or consular purposes."  Section 201(d)(2)(B)(ii).  The TRIA defines diplomatic and

consular property as follows:

> The term "property subject to the Vienna Convention on Diplomatic Relations
> or the Vienna Convention on Consular Relations" and the term "asset subject to the
> Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular
> Relations" mean any property or asset, respectively, the attachment in aid of
> execution or execution of which would result in a violation of an obligation of the

United States under the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, as the case may be.

Section 201(d)(3).

Accordingly, properties subject to the Vienna Convention that are being held exclusively for diplomatic purposes are not subject to attachment under the TRIA.

Last term, with the enactment of the § 1083 of the 2008 National Defense Appropriations Act (NDAA), Congress implemented changes to the FSIA in an effort to clarify the circumstances under which the property of a foreign state sponsor of terrorism is subject to attachment and execution. See Pub. L. No. 110-181, 122 Stat. 3, § 1083. The result is now codified as 28 USC. § 1610(g). That new section provides:

> (g) Property in certain actions. –
>
> (1) In general. – Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridicial entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of –
>
> (A) the level of economic control over the property by the Government of the foreign state;
>
> (B) whether the profits of the property go to that government;
>
> (C) the degree to which officials of that government manage the property or otherwise control its daily affairs
> (D) whether the government is the sole beneficiary in interest of the property; or
>
> (E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States Courts while avoiding its obligations.

Notably, § 1610(g) is silent with respect to diplomatic properties; it makes no mention of the Vienna Convention, the Foreign Mission Act, or the TRIA, and does not otherwise evince

16

an intent to allow for the attachment of diplomatic proprieties.  Thus, even if the full scope or

application of § 1610(g) is not entirely clear, a plain reading of the new enactment in now way

provides a sufficient basis for stripping away the immunity long afforded to diplomatic

property.

This plain reading and common sense understanding of the statute is reinforced by the

Conference Report to § 1083, which strongly suggests that Congress did not intend for §

1610(g) to allow for attachment or execution of diplomatic properties.  That Report states: "The

conferees intend that property used for purposes of maintaining a diplomatic of consular

mission or the residence of the Chief of Mission, which is not subject to execution or

attachment in aid of execution of a judgment, should not be subject to a lien of lis pendens

under this provision." *See* Conf. Rep. to H.R. 1585, p. 10010 (December 6, 2007).

Accordingly, it appears that Congress drafted § 1610(g) with the assumption that diplomatic

properties are not subject to attachment.  Moreover, § 1610(g), by its express terms, applies

only to "judgments entered under 1605A," and thus this new provision is not available to

plaintiffs, like the Bennetts in this action, who have judgments under § 1605(a)(7).


### *(4) Executive Actions Pertaining to Iran's Foreign Mission Properties*

Plaintiffs' effort to attach properties that once served as the Iranian Embassy complex

directly implicates United States foreign policy, including sensitive national security concerns,

and thus the status this Court should accord those properties, and, ultimately, the issue of

whether they should be subject to attachment, depends in large part on the policy decisions of

the President and other actions taken by the Executive Branch.  As the Supreme Court has

recognized time and again, "[m]atters relating to the conduct of foreign relations . . are so

17

exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Regan v. Wald*, 468 U.S. 222, 242 (1984)(quoting *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952)). This is true particularly where, as here, Congress has vested the State Department with sweeping authority to manage former diplomatic properties in the United States. *Palestine Information Office*, 853 F.2d at 937; *See Dames & Moore v. Regan*, 453 U.S. 654, 669 (1981). A review of the policy decisions in this area reveals in no uncertain terms that the Executive Branch has consistently taken the position that properties once used by the Iranian Foreign Mission should be protected under the Vienna Convention and are therefore immune from attachment.

The relationship between Iran and the United States deteriorated as a result of the Iran hostage crisis, which began on November 4, 1979, when a large group of Islamist students seized the American Embassy in Tehran and took all 52 members of the embassy staff as hostages. In response to this crisis, President Carter issued an Executive Order blocking all Iranian assets in the United States. Executive Order 12170, 44 FR 65729 (November 14, 1979). At that time, Iran continued to use the properties of its foreign mission here in the United States, including its diplomatic properties here in the Nation's Capitol.[6]

---

[6] For this portion of the opinion, the Court relies in large part on the declaration provided to the Court by Claude J. Nebel while he was serving Deputy Assistant Secretary of State for Diplomatic Security and Chief of the Office of Foreign Missions. That declaration as noted above, *supra*, n.1, has been offered by the United States as an exhibit in support of its motion to quash the writs of attachment, and is included as Exhibit 1 to the Government's brief in support of the motion to quash. *See* Dk. # 34, Exh. 1. The Court also relies on certain documents furnished in connection with Deputy Assistant Secretary Nebel's declaration and included as separate exhibits to his declaration. These documents include compilations of statements and directives of President Carter in connection with the termination of diplomatic relations with Iran. The exhibits also include copies and secondary source compilations of diplomatic notes and other Department of State correspondence relating to the severance of diplomatic relations with Iran and the status of Iran's Foreign Mission Properties in the United States. These

18

Approximately five months later, as the hostage crisis waned on, President Carter severed diplomatic relations.  In accordance with the President's directive, the Secretary of State, by diplomatic note, informed the Embassy of Iran on April 7, 1979 that all Iran's diplomatic properties were to be closed and sealed, except to the extent that such properties might be used, with State Department approval, by a designated protecting power for Iran.

About a year later, on April 14, 1980, Algeria was approved by the State Department as the protecting power for Iranian interests in the United States.[7]  At that time, however, the Department of State informed Algeria that the United States would retain custody of Iran's diplomatic premises until the United States, or its Protecting Power, regained custody of the American embassy in Tehran.  The State Department later stressed that its refusal to turn over Iranian diplomatic properties to Algeria, "was a reciprocal action taken in response to Iran's breach of its obligations under the Vienna Contention to respect and protect the diplomatic and consular properties of the United States and to permit Switzerland, the United States Protecting Power in Iran, to assume custody of those properties." Dk. # 34, Exh. 1 at p. 4.

Thus, the State Department asserted control over Iran's diplomatic properties here in the United States and Algeria was never authorized to take custody of Iran's diplomatic properties.

---

miscellaneous source materials are included in the record as exhibits with Deputy Assistant Secretary Nebel's declaration  The plaintiffs have not challenged Deputy Assistant Secretary Nebel's declaration or any of the documentary exhibits included therewith.  Moreover, the declaration underscores points that the plaintiffs apparently believe are relevant to this dispute, namely, that the buildings on the properties at issue are not occupied and are in need of repair.  *See id.* at p. 6-8.  For purposes of this opinion, the Court will assume the truth of plaintiffs' assertion that the buildings on Iran's properties are "not adequately cared for, are not rented, and are in need of rehabilitation."  Dk. # 35 at p. 7.

[7] Algeria served initially as Iran's Protecting Power for Iranian interests in the United States.  Pakistan now serves that role.

In response to concerns expressed by Algeria regarding the security and upkeep of Iran's diplomatic properties, the State Department assured Algeria that it would take appropriate measures ensure the safety and protection of Iran's diplomatic properties within the United States. *See* Dk. # 34, Exh. 1 at p. 3.

In 1982, Congress passed the Foreign Missions Act, which as noted above established the Office of Foreign Missions and formalized the State Department's authority and responsibilities with respect to diplomatic properties in the United States. After considering ways to maintain Iran's official properties consistent with the Vienna Convention, OFM eventually decided that, to the extent possible, it would rent Iran's properties in furtherance of its obligations to protect those properties under the Vienna Convention. The State Department, which was then under the administration of President Ronald Reagan, promptly informed Algeria of its decision by diplomatic note, dated March 10, 1983. That note reads in pertinent parts as follows:

> Since assuming custody of the Iranian properties following the break in diplomatic relations, the Department has undertaken to respect and protect them in accordance with Article 45 of the Vienna Convention on Diplomatic Relations.
> ....
>
> . . . .The Department considers that rental would protect Iran's interest in these properties by ensuring maintenance of their commercial value.
> It would be appreciated if the Embassy of the Democratic and Popular republic of Algeria Could transmit the foregoing message to the Government of the Islamic Republic of Iran as soon as feasible.
>
> *Department of State, Washington, March 10, 1983*[8]

Since 1983, OFM has periodically rented Iran's diplomatic properties to both foreign states and

---

[8] Th Diplomatic Note is included with the materials attached as exhibits to Deputy Secretary Nebel's Declaration. *See* Dk. # 34, Exh 1 to Exh 1.

states private parties.  For instance, the Embassy building and the diplomatic residence on

Garfield Street have been rented out to private tenants over the years; Iran's former Chancery at

3005 Massachusetts Avenue was rented out to Turkey for a period of time; and the parking lots

have been rented out periodically to other foreign missions or private parties.  *Id* at p. 6-8.

At the moment, however, the properties are not being rented and the buildings on the properties

are in need of repair.  *Id*; Dk. # 35 at p. 7

According to Deputy Assistant Secretary Nebel, the OFM's "actions in connection with the

maintenance and rental of Iran's diplomatic and consular property have been and  to be taken

exclusively for diplomatic and consular purposes as such actions are in furtherance of

obligations of the United States, as the receiving State, to protect the property pursuant to the

Vienna Conventions."  *Id* at p. 5.  The proceeds from the rental of the properties are used to

maintain and repair the properties and any excess funds "are deposited in a blocked Iranian

diplomatic account and not used for any other purpose." *Id*.

Notably, OFM "protects and preserves the Iranian diplomatic properties in a  manner

consistent with the offices's management of other countries' diplomatic properties when, in the

absence of diplomatic relations, custody has not been turned over  to a protecting power." *Id* at

p. 5.  In the 1980s, for example, OFM renovated and rented out the diplomatic properties of

Vietnam and Cambodia.  Since the United States resumed normal diplomatic relations with

those countries, both nations have returned their foreign missions to their respective properties

here in the United States.  Moreover, Assistant Deputy Secretary Nebel claims that, "as a direct

result of the actions of the United  States protecting Vietnam's properties during the absence of

relations and returning those  properties when relations resumed, Vietnam returned to the U.S.

numerous U.S. diplomatic  properties in Vietnam." *Id* at p. 6

President Clinton, who normalized United States diplomatic relations with Vietnam, twice executed waivers with respect to provisions of the FSIA that would have otherwise permitted the attachment of diplomatic properties owned by state sponsors of terrorism, as explained above When President Clinton first exercised his express waiver authority in order to protect diplomatic properties of states sponsors of terrorism, the White House issued the following statement:

> [T]he Struggle to defeat terrorism would be weakened, not strengthened, by putting into effect a provision of the Omnibus Appropriations Act for FY 1999. It would permit individuals who win court judgments against nations on the State Department's terrorist list to attach embassies and certain other properties of foreign nations, despite U.S. laws and treaty obligations barring such attachment.
>
> The new law allows the President to waive the provision in the interest of national security interest of the United States. President Clinton signed the bill, and in the interests of protecting America's security, has exercised the waiver authority. If the U.S. permitted attachment of diplomatic properties, the other countries could retaliate, placing our embassies and citizens overseas at grave risk. Our ability to use foreign properties as leverage in foreign policy disputes would also be undermined.
>
> *Statement by the Press Secretary* (October 21, 1998) (*reproduced in Suits Against State Sponsors of Terrorism,* Congressional Research Serv. Rep. RL31258 at p. 51 (updated August 8, 2008).

As the White House's statement clearly indicates, the Clinton Administration feared that permitting FSIA judgment-creditors to attach "embassies and certain other properties of foreign nations" would undercut United States' treaty obligations and have substantial negative consequences with respect national security and foreign relations matters.

Last summer, the Justice Department, then under the control of the Bush administration filed the pending motion to quash the five writs of attachment on Iran diplomatic properties issued in this case on behalf of Michael and Linda Bennett and the Estate of their daughter,

Marla Ann Bennett.  As Deputy Assistant Secretary Nebel's declaration makes clear, the State

Department's position then, and presumably now, is entirely consistent with the position taken

by the State Department throughout the preceding two decades during which the Department

has stressed, time and again, that Iran's diplomatic properties are under the protective custody of

the OFM in accordance with the Federal Government's responsibility to respect and protect

protect those premises under Articles 22 and 45 of the Vienna Convention.

A review of the relevant Executive Branch decisions and actions since the termination of

diplomatic relations with Iran in 1980 reveals that there has been universal agreement – as

specifically expressed by at least four different Presidential administrations and through the more

than 30 years of continued preservation of Iranian diplomatic properties – that the protection of

these properties is an important foreign policy objective of the United States.


### (5) *Prior Decisions Regarding Efforts to Attach Iran Former Diplomatic Properties*

As noted above, this case is not the first time that a judgment-creditor of Iran has sought to

attach properties that Iran formerly maintained for its diplomatic mission.  Indeed, this Court

has ruled on three different occasions with respect to efforts to attach many of the very same

Iranian embassy properties that are now at issue in this case.  *See Flatow*, 76 F.Supp. 2d 16;

*Mousa v. Iran*, 00-cv-2096 (D.D.C. 2003) (Bryant, J.); *Elahi v. Islmaic Republic of Iran, 99-cv-

02802* (D.D.C. 2003) (Lamberth, J).  Moreover, a few other courts have had opportunity to pass

on similar efforts to attach Iranian diplomatic or consular properties within their respective

jurisdictions.  *See Hegna v. Islamic Republic of Iran*, 376 F.3d 485 (5th Cir. 2004); *Hegna v.

Islamic Republic of Iran*, 287 F.Supp. 2d 608 (D. Md. 2003).

Without exception, every court that has passed on the question has determined that  the

properties Iran once used for diplomatic purposes here in the United States are not subject to

attachment or execution.  In *Flatow*, for example, this Court ruled that the commercial activity

exception to the FSIA, § 1610(a)(7), does not permit the attachment of Iran's real properties that

were once used for diplomatic purposes when these properties are held and maintained in

protective custody by the OFM.. 76 F. Supp. 2d at 23.  Moreover, in an unpublished ruling in

*Elahi,* this Court determined that the attachment of these properties would violate multi-lateral

treaty obligations owed by the United States under both the Vienna Convention.  00-cv-02802, p.

2-3.  Consequently, this Court ruled in that case that the TRIA had excluded these former

diplomatic properties from the definition of "blocked assets," and thus the properties maintained

their immunity from attachment under the FSIA. *See Id.*   Judge Bryant of this Court, Judge

Motz of the District of Maryland, and the 5th Circuit Court of Appeals have all reached the same

conclusion. *See Hegna, 376 F.3d at 495-96; Mousa,*.00-cv-02096 at p. 8; *Hegna*, 287 F.Supp.2d

608 at 610-611.


**Analysis**

This Court's review of the relevant legal sources – when considered in light of the Office of

Foreign Mission's continued assertion of authority over Iran's former diplomatic properties

under the Foreign Missions Act – leads to inescapable conclusion that the real  properties at

issue are currently immune from attachment under the laws of the United States, and therefore

the Government's motion to quash will be granted.  With the preceding legal discussion as the

foundation for this Court's decision, the Court will now briefly address the key arguments raised

by the parties during this litigation.

### *(1) The United States Has Standing to Move to Quash the Writs of Attachment*

The plaintiffs' argument that the United States lacks standing in this action is without

merit and essentially frivolous.  This Circuit has consistently recognized that the United States

has standing to bring actions necessary to uphold its foreign policy obligations under

international agreements, particularly those relating to Iran.  *See e.g., Roeder v. Islamic*

*Republic of Iran*, 333 F. 3d 228, 233-34 (D.D.C. 2003); *Persinger v. Islamic Republic of Iran*,

729 F.2d 835, 837 (D.C. Cir. 1984).  Indeed, this Court has recognized on numerous occasions

that the United States has standing, pursuant to 28 § U.S.C. 517, to bring a motion to quash

writs of attachment issued against Iran foreign mission properties and other protected assets.

*See e.g., Weinstein v. Islamic Republic of Iran*, 274 F. Supp.  2d 53, 55 n.1 (D.D.C. 2003)

(Lamberth, J.); *Flatow*, 76 F. Supp. 2d at 18 n.1.  Moreover, longstanding Supreme Court

precedent establishes that the Attorney General has standing to initiate civil litigation in order to

uphold United States foreign policy obligations under international treaties.  *See Sanitary Dist.*

*Of Chicago v. United States*, 266 U.S. 405, 425-426 (1925).

Whatever might be said of the decisions issued by the Northern District of Illinois in

*Rubin*, those rulings simply do not apply here.  *See Rubin v. Islamic Republic of Iran*, 408 F.

Supp. 2d 549 (N.D. Ill. 2005), *aff'd*, 436 F. Supp. 2d (N.D. Ill. 2006).  In *Rubin* a magistrate

judge considered efforts by private parties, namely the University of Chicago and others, to

defeat writs of attachment issued against Persian artifacts on loan to the University from Iran.

The University of Chicago claimed that it had standing to challenge the writs on sovereign

immunity grounds or to otherwise serve as Iran's proxy in the litigation.  Thus, in *Rubin* the

plaintiffs were literally seeking to represent the interests of Iran..

In contrast to private interests asserted in *Rubin*, the United States in this action seeks to

uphold its own, independent foreign policy obligations under the Vienna Convention and the

Foreign Mission Act.  As explained above, the Federal Government's duty to protect and respect

the diplomatic properties of other nations does not depend on the current state of our relations

with those foreign powers.  The level of hostility between the United States and Iran simply

make no difference. Quite the contrary, under Article 45 of the Vienna Convention, the United

States must meet its obligations to protect and respect diplomatic properties, even when, as in

this case, diplomatic relations have been strained and, at times, are openly hostile.

     More fundamentally, plaintiffs' counsel fail to note that the Magistrate Judge in the *Rubin*

action discussed this Court's ruling in *Flatow* and expressly acknowledged that the United

States Government does have standing, consistent with its obligations under the Foreign

Mission Act, to challenge writs of attachment issued against Iran's diplomatic properties.

*See* 408 F.Supp. 2d at 558-59.  By doing so, the magistrate judge distinguished his case, which

involved private third parties and generalized Executive Branch concerns about foreign policy

under the FSIA, from the specific duty of the Federal Government to protect and respect foreign

diplomatic properties. Accordingly, it is hard for this Court to understand how the *Rubin*

decision supports plaintiffs at all.  Moreover, this Court is concerned that while counsel has

vigorously urged this Court to adopt his selective reading of case precedent from the Northern

District of Illinois, he has failed to discuss, let alone cite, the controlling case precedent from

this District Court and the D.C. Circuit.

     Finally, this Court observes that plaintiffs' counsel, much like counsel in *Roeder*,

consistently offers up mischaracterizations of the nature of the interests the United States seeks

to assert in this action.  *See* 195 F.Supp. 2d at 155.  The United States, as emphasized

throughout this discussion, is not appearing in this action in order to defend the the Islamic

Republic of Iran, as counsel's rhetoric tends to suggest; rather the United States seeks to uphold

its obligations under multi-national treaties in furtherance of broader foreign policies objectives.

In fact, the statement issued by the Clinton White House in 1998, *supra*, p.22-23, seems to

accurately summarize the foreign policy and national security interests the United States has at

stake in this highly charged, politically sensitive context.

This Court recognizes that plaintiffs believe that the United States is misguided in its

conduct of foreign policy in this instance. To all the victims in these actions, it must certainly

feel as if the United States has turned against them in favor of state sponsors of terrorism.

Nonetheless, counsel's rhetoric is neither accurate nor fair, and it certainly does not establish a

basis on which this Court can deny the United States standing in this action. Plaintiffs have a

right to express their frustration with respect to United States foreign policy, but that frustration

should be directed to the foreign policy decision makers within the Executive Branch, or in

Congress, who have the power to authorize the relief plaintiffs' desire.[9]

---

[9] Plaintiffs claim that the Office of Foreign Missions is laboring under a misunderstanding of the United States' obligations under the Vienna Convention. In support of this claim, plaintiffs note that whereas Article 22 states that diplomatic properties are immune from attachment and execution, Article 45 is silent on the matter. Plaintiffs therefore argue that under Article 45 of the Vienna Convention, foreign mission properties are subject to attachment and execution whenever diplomatic relations are severed. Plaintiffs' interpretation of Article 45 is untenable. As an initial matter, nothing in Article 45 indicates that it is intended to abrogate or otherwise supplant the Receiving States's duties to protect and respect foreign mission property as described in Article 22. Indeed, Article 45 by its plain terms serves to clarify and reinforce that the Receiving State must respect and protect the property of a foreign mission even after relations with that foreign power turn cold or hostile. In addition to underscoring the inviolable nature of the Receiving State's responsibility to protect and respect a foreign nation's mission properties, Article 45 serves to offer the Receiving State a number of practical approaches that the Receiving States may use to fulfil those obligations after diplomatic relations have been severed. For example, the Receiving state *may* entrust the premises of the mission to a third state. *See* Article 45(b). Thus, rather than supplant Article 22, as plaintiffs suggests, Article 45 merely supplements that provision with some practical approaches that the Receiving State may, within its discretion, utilize to fulfil its Article 22 obligations. More fundamentally, however,

***(2) The Supplemental Materials Filed by Plaintiffs Are Not Properly Before the Court and therefore the Court will Strike those Documents from the Record***

Plaintiffs' supplemental filing, Dk. #37, is untimely and was filed without leave of

the Court and therefore it will be struck from the docket. *See e.g., D.L. v. District of Columbia*,

450 F.Supp. 2d 11, 20 (D.D.C. 2006) (Lamberth, J.). Additionally, the supplemental

memorandum and related materials are simply not relevant to any matter of consequence in this

action, and thus this Court need not consider them. *See Judicial Watch, Inc. v. U.S. Dep't of*

*Commerce*, 224 F.R.D. 261, 263 (D.D.C. 2004)(Lamberth, J.).


***(3) For the reasons stated in Flatow, the Commercial Activity Exception does not Apply in this Case.***

In the decade since *Flatow* was decided, the factual circumstances relating to the Iranian

Embassy Properties have not changed in a way that would require this Court to revisit its prior

---

what plaintiffs have articulated in this case is best characterized as an expression of disagreement and frustration with United States foreign policy as it relates to the diplomatic properties of state sponsors of terrorism. As explained in this portion of the opinion, however, those disagreements and frustrations are best directed to the policy makers within two political branches of the federal government. Much like this Court cannot deny the United States standing to defend its foreign policy positions in connection with multilateral treaties, this Court also lacks the authority to pass judgment on the merits of those foreign policy determinations. *See e.g., Holmes v. Laird*, 459 F.2d 1211, 1215 (D.C. Cir. 1972) (stressing that questions concerning the extent of United States treaty obligations toward other foreign governments are largely nonjusticiable political questions) *Kucinich v. Bush*, 236 F. Supp. 2d 1, 16 (D.D.C. 2002) (stressing issues concerning the interpretation of treaties and other agreements between sovereign powers "are largely political questions best left to the political branches of the government, not the courts, for resolution."

28

ruling with respect to the commercial activities exception of the FSIA, § 1610(a)(7).  The

plaintiffs' arguments on this issue lack merit.  As this Court explained in *Flatow*, the availability

of the commercial activity exception turns on whether the foreign state – in this case Iran – is

using the properties at issue for a commercial purpose *Flatow*, 76 F.Supp. 2d at 23.  Iran was

using the properties at issue exclusively for diplomatic purposes when the United States severed

diplomatic relations in 1979.  To the extent that there has been any commercial activity in

connection with those properties since then – such as the leasing of those properties to private

parties – that activity has been carried out by the United States under the auspices of the Foreign

Mission Act.  "Put simply, although the leasing of property by a private party might be

commercial in nature, taking custody over diplomatic property under the authority granted by a

federal statute or treaty is decidedly sovereign in nature." *Id* at 23.

It makes no difference that the Iranian Foreign Mission properties here in Washington are

currently unoccupied and apparently in poor condition.  Under the Foreign Mission Act –

particularly §§ 4301(c) and 4305 – the Department of State is vested with exceedingly broad – if

not exclusive – discretion with respect to the preservation of those properties.  In exercising that

discretion, the Office of Foreign Missions undoubtedly must consider an array of issues and

competing priorities in light of limited resources.  This Court is not free to second guess that

Executive agency's decision making under these circumstances.

Moreover, the Foreign Mission Act expressly provides that properties held in protective

custody by the Department of State are not subject to attachment or execution.  *See* § 4308(f).

Thus, the manner in which the Office of Foreign Missions has exercised its own prerogative to

maintain Iranian diplomatic properties within its custody simply has nothing to do with the

ultimate question of whether those properties are entitled to immunity from attachment. To be

blunt, even if the properties at issue have been so poorly maintained that they are not currently

capable of being occupied, as plaintiffs suggest is the case, it simply does not follow that, as

consequence of that neglect, the United States has somehow forfeited these properties to the

judgment-creditors of Iran.

### (4) § 1610(g) Does Not Strip Away Sovereign Immunity Accorded to Iran's Diplomatic Properties

As noted above, plaintiffs are not entitled to rely on § 1610(g) because their FSIA

judgment is under § 1605(a)(7), and they have not elected to proceed under latest state sponsor of

terrorism provision, § 1605A. More fundamentally, however, this Court finds that even if the

plaintiffs could suddenly bring their action under § 1605A, it would not alter the outcome with

respect to their writs of attachment. As noted above, nothing in § 1610(g) indicates that

Congress intended to strip away the immunity long afforded to diplomatic properties. This plain

language interpretation of § 1610(g) is reinforced by the legislative history relating to that

enactment. Moreover, in other enactments under the FSIA, such as the TRIA and the VTVPA,

Congress has clearly and directly addressed the issue of whether and to what extent diplomatic

properties of terrorist states should be afforded immunity from attachment and execution.

Congress' complete silence on the matter in this most recent enactment indicates that they did not

intend to pare back the immunity that they have long afforded to diplomatic properties.

Even if plaintiffs could offer up some contrived reading of § 1610 to support their claim

that Iranian diplomatic properties are now subject to attachment, this Court would have to resolve the statutory ambiguity on this matter in favor of the Government in light of the clear immunity accorded such properties under both the Foreign Missions Act and the Vienna Convention. *See e.g.*, *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 446 U.S. 243, 252 (1984); *Hegna,* 287 F.Supp. 2d 610-611. Moreover, to deny those diplomatic properties immunity in the absence of express guidance from Congress would, in this Court's view, constitute an unwarranted encroachment on the President's authority to conduct foreign affairs.

In ruling that plaintiffs' writs of attachment must be quashed, this Court is certainly mindful of the long and difficult pursuit of justice that the Bennetts and so many other victims of terrorism have had to endure. Under the current state of the law, however, this Court has no choice but to grant the Government's motion to quash. If, at some later time, Congress or the President decide that the sorts of diplomatic properties at issue in this case should be subject to attachment, then this Court will of course reconsider the matter.

A separate order consistent with this opinion shall issue this date.


**ROYCE C. LAMBERTH**
**Chief Judge**


**Signed on March 31, 2009**


31